OPINION OF THE COURT
Barbara Salinitro, J.
On November 22, 1999, the Association to Benefit Children/ Variety House (Agency) filed a petition pursuant to section 384-b of the Social Services Law requesting that the court terminate the parental rights of S.D. and W.S. to the subject child A., who was born on October 27, 1987. The Agency also filed petitions requesting that the court terminate the rights of S.D. and G.R. to the subject child G., who was born on September 24, 1996. Both children had been living with their maternal grandfather R.D., and his wife A.D., since July 1997 based on neglect findings against S.D. The termination petitions were subsequently withdrawn when S.D., G.R. and W.S. agreed to voluntarily surrender their parental rights to the subject children. On December 14, 2000, S.D. and W.S. executed surrenders before a Family Court judge. On January 12, 2001, G.R. also executed a judicial surrender in Family Court. The original surrender documents each contained the following condition: “I/We understand that the foster parent(s), [R.D. and A.D.] will adopt the within named child, otherwise this surrender shall be null and void.” During the court’s allocution of S.D., she stated, “I want the children strictly with my father, not [A.D.]” (transcript, Dec. 14, 2000 at 7). The judge then gave S.D. the opportunity to consult with her attorney outside the presence of the court. When the matter was before the court again, S.D.’s attorney indicated that he had spoken to his client and that the Agency had agreed to amend the judicial surrender applications to delete A.D.’s name as an adoptive parent. Before doing so, the judge said to the Agency’s attorney: “I’d be striking the reference to [A.D.]?” and the Agency at *502 torney replied: “Yes. That’s correct Judge.” The judge then asked the attorney: “Any objections to that?” and the attorney answered “No.” (Transcript, Dec. 14, 2000 at 8.) The reference to A.D. in the surrender documents was then stricken, rendering them conditioned on the adoption of the children by R.D. only. S.D. initialed the changes, and the allocution continued. At the conclusion of the allocution, S.D. executed surrenders for both children before the court. With the consent of counsel, the court then amended the surrender that was prepared for W.S. by deleting A.D.’s name from the document. After a full allocution, W.S. then executed a surrender of the child, A, On January 12, 2001, G.R. appeared in Family Court and executed a surrender of his rights to the child G. after a full allocution. His surrender was amended to delete A.D.’s name as an adoptive parent from the document. G.R. initialed the change and signed the surrender.
On June 19, 2001, R.D. and A.D. filed petitions to adopt both subject children together as husband and wife. These petitions were subsequently assigned to this court for review. Upon reviewing the petitions and the supporting documents, this court realized that all the surrenders were conditioned upon R.D.’s adoption of the children, and that the biological parents had indicated that they were not consenting to A.D. adopting the children. Since this court was aware that under the Domestic Relations Law R.D. could not adopt the children without his wife A.D., it then brought this problem to the attention of counsel.[1] Subsequently, the attorney for R.D. and A.D. made a motion before this court requesting that it either allow both R.D. and A.D. to adopt jointly, regardless of the condition contained in the surrenders, or allow R.D. to adopt alone. The court then heard oral arguments on the motion.
Section 110 of the Domestic Relations Law delineates who may adopt. The statute reads in pertinent part:
“An adult unmarried person or an adult husband and his adult wife together may adopt another person. An adult married person who is living separate and apart from his or her spouse pursuant to a decree or judgment of separation or pursuant to a written agreement of separation * * * or an adult married person who has been living separate and apart from his or her spouse for at least three years *503 prior to commencing an adoption proceeding may adopt another person.”
The statute specifically indicates the circumstances under which a married person may adopt. The statute provides that a married adult must adopt together with his/her spouse unless they have either been living apart for at least three years or have been legally separated. A married adult whose spouse does not join in the adoption petition does not have standing to adopt another person under the statute. Counsel for the prospective adoptive parents in this matter argues that the Court of Appeals does not require a strict construction of the adoption statute based on its decision in Matter of Jacob (86 NY2d 651, 658 [1995]). In Jacob, the Court allowed the homosexual partner of a biological parent to adopt the child of that individual. The Court noted that the purpose of the adoption statute was to further, the best interests of children. In Jacob, however, the prospective adoptive parent was an unmarried individual. Under the clear language of Domestic Relations Law § 110, an unmarried person has standing to adopt. The Court even noted that “[t]he statute uses the word ‘together’ only to describe married persons and thus does not preclude an unmarried person in a relationship with another unmarried person from adopting.” (Id. at 660.) The statute does, however, preclude a married individual in an intact marriage from adopting without his/her spouse. Moreover, the Court in Jacob never advocated contravening the clear language of the statute to confer standing on an individual. In fact, the Court in Jacob stated that both the language of the statute as well as its legislative intent must be strictly construed. (Id. at 659.) In 1984 and again in 1991, Domestic Relations Law § 110 was amended to allow married adults to adopt without their spouses under certain circumstances. Those circumstances are the ones that are currently delineated in Domestic Relations Law § 110. In 1984 (L 1984, ch 218, § 1), the statute was amended to allow a married individual who is living separate and apart from his/her spouse to adopt when there is a judgment of separation or a written agreement of separation. In 1991 (L 1991, ch 254, § 1), the statute was amended again to allow a married individual who is living apart from his/her spouse for at least three years to adopt. The clear intent of the Legislature in amending the statute was to enable more children to be adopted. In expanding the definition of who may adopt, the Legislature placed certain safeguards in the statute to ensure that only certain married individuals could adopt. It is clear to this court that the Legislature intended that only *504 married individuals who evince a clear intent to live separate and apart from their spouses should be able to adopt alone and that intact married couples must adopt together. In Matter of Jessalyn AA. (276 AD2d 97 [3d Dept 2001]), the Appellate Division affirmed a lower court’s finding that a petitioner whose wife did not join in his application to adopt a child lacked standing under Domestic Relations Law § 110. The Court stated:
“In reviewing the adoption statute, which must be strictly construed * * * we find the language of the statute free from ambiguity and a plain, clear and distinct expression of legislative intent * * * We note particularly that the failure of the Legislature to include a provision in Domestic Relations Law § 110 allowing prospective adoptive parents in petitioner’s situation to file a petition for adoption is considered presumptively intentional.” {Id. at 98.)
This court agrees. Moreover, the court also believes that allowing only one half of a married couple to adopt would detract from the child’s permanency. As stated by the Court of Appeals in Jacob:
“[G] ranting a second parent adoption further ensures that two adults are legally entitled to make medical decisions for the child in case of an emergency and are under a legal obligation for the child’s economic support * * *
“Even more important, however, is the emotional security of knowing that in the event of the biological parent’s death or disability, the other parent will have presumptive custody, and the children’s relationship with their parents, siblings and other relatives will continue should the coparents separate.” {Jacob at 658-659.)
Allowing R.D. to adopt alone would render A.D. a legal stranger to the children despite the fact that the children have been living with her for over four years. Thus, it is clear that R.D. may not adopt the subject children without his wife A.D., and that such an adoption would not be in the children’s best interest. Therefore, the judicial surrenders as executed contain a condition which cannot be legally satisfied.
Alternatively, the attorney for R.D. and A.D. argues that the court may allow them to adopt the subject children together although the surrenders only contain R.D.’s name as the adop *505 tive parent. R.D. and A.D. contend that S.D.’s wishes would in fact be achieved if they adopted the children together since R. D. would still be an adoptive parent. This argument, however, ignores the biological mother’s clear statement: “I want the children strictly with my father, not [A.D.]” (transcript, Dec. 14, 2000 at 7). S.D. was given the opportunity to consult with her attorney after she made this statement. After this consultation, S.D. had several options: she could have refused to sign the surrenders at all, she could have agreed to sign them as they were originally drafted, or she could have insisted that A.D.’s name be deleted from the documents. S.D. chose to have A.D.’s name deleted from the surrenders before signing them. If S.D.’s position seemed uncertain to the court and the Agency before she spoke with her lawyer, her subsequent actions certainly clarified her position. S.D. was clearly not consenting to A.D. adopting her children.
R.D. and A.D. also argue that while S.D. had the authority to specify who could adopt the children, she did not have the authority to prohibit a particular individual from adopting them. In Matter of Shannon F. (175 Misc 2d 565 [Fam Ct, Richmond County 1998]), the court held that a surrender instrument executed by a biological mother was a nullity since it contained the express condition that the children be adopted by their grandmother who died before she could adopt them. The court stated that “[i]t is absolutely clear to this court that Ms. P. F. executed the conditional surrenders solely for the purpose of having her two children adopted by Ms. P. The surrenders do not authorize the adoption of the children by anyone other than Ms. P.” (Id. at 567; emphasis added.) The court held that the surrender instrument was a nullity because the condition could never be met. Likewise, in the matter before this court, S.D. has not authorized the adoption of the children by anyone other than R.D. In Matter of Christopher F. (260 AD2d 97 [3d Dept 1999]), the Court stated:
“As can be seen, the plain language of Social Services Law § 383-c (2) and (5) (b) (iii) mandates the conclusion that, in enacting Social Services Law § 383-c, the Legislature intended that biological parents be permitted to establish terms for and impose conditions upon the adoption of their children, including the right to select the proposed adoptive parent or parents, subject only to the advance approval of the court.”
S. D. clearly did have the authority to impose conditions on the *506 adoption of her children. If this court allowed A.D. to adopt the children, it would be violating the express condition to which S.D. agreed in signing the surrenders. Moreover, although the biological fathers did not specifically state any objections to A.D. adopting the children, their allocutions show that they believed that only R.D. would be the adoptive parent. Both biological fathers also initialed the deletion of A.D.’s name from the surrenders before signing them. Therefore, since R.D. cannot adopt the children alone, and A.D. cannot adopt the children at all under the current circumstances, the petitions for adoption must be dismissed.
In rendering its decision, this court is cognizant of the fact that its ruling does not prevent these children from finding permanency with this family. The Agency has several options which it may pursue to realize this goal. The Agency may file new termination cases against each of the biological parents, or it may seek out each parent to have new, enforceable surrenders signed.[2] The judge who originally accepted the surrenders is now aware of the need for future litigation in order for these children to achieve permanency and has indicated his willingness to hear these matters on an expedited basis.
In addition to addressing the merits of the motion, the court is compelled to address the conflict of interest that exists with the legal representation of the foster parents. Upon reviewing the adoption file, the court discovered that the same law firm that represents the Agency identified herein now also represents the prospective adoptive parents in their adoption petitions. The court believes that such dual representation presents an inherent conflict of interest. In its determination, the court is guided by Matter of Vincent (158 Misc 2d 942 [Fam Ct, NY County 1993]). In Vincent, the court held that such dual representation was inappropriate since a conflict of interest could have arisen at any time during the proceedings.
The court is further instructed by an opinion issued by the New York State Bar Association’s Committee on Professional Ethics. The question presented to the Bar Association was:
“May an attorney who represents a foster care agency in extra-judicial surrender proceedings under Soc. Serv. Law 383-c (4) or termination of parental rights proceedings under Soc. Serv. Law *507 384-b represent prospective adoptive parents who are seeking to adopt the child involved in those proceedings?” (1998 Opns NY St Bar Assn Comm on Prof Ethics No. 708.)
The Committee concluded that an attorney may not do so and cited Vincent in its decision. A lawyer who represents a foster care agency may not also represent adoptive parents either in concurrent or subsequent proceedings. According to the Committee, concurrent representation is inappropriate because the foster care agency’s mandate is to promote the best interests of the child while the goal of the prospective adoptive parents is to adopt the child. While these interests may sometimes be the same, they can also differ. Moreover, the goal of the agency can change during the pendency of the proceedings and the attorney would be left to advocate two different positions in the same proceeding. Thus, an attorney should refrain from representing both a foster care agency and prospective adoptive parents. (Code of Professional Responsibility DR 5-105 [a] [22 NYCRR 1200.24 (a)].) The Committee also stated that under DR 9-101 (b) (1) (22 NYCRR 1200.45 [b] [1]) and Code of Professional Responsibility Canon 9, a lawyer may not represent a foster care agency in one proceeding and then at the conclusion of that litigation subsequently represent the prospective adoptive parents. Such representation may create an appearance of impropriety since it may appear that the attorney, when representing the agency, was overly zealous in advocating for the termination of parental rights, regardless of whether it was in the child’s best- interests, in order to obtain subsequent employment as the attorney for the foster parents.
In the matter before this court, a conflict of interest clearly exists. The same law firm that represented the foster care agency in the termination and surrender proceedings now represents the prospective adoptive parents in the adoption petition currently pending before this court. This firm prepared the surrenders which contained conditions that cannot be realized thus delaying the permanency for the children sought by their other clients.

. A review of the transcripts from the surrender proceedings shows that none of the attorneys involved in the execution of the surrenders brought this legal impediment to the adoption to the attention of the judge.

. W.S., the biological parent of A., wrote a letter to this court on August 9, 2001, indicating that he wanted both R.D. and A.D. to adopt A. W.S. also appeared before this court and was present during the oral arguments on the instant motion.