OPINION OF THE COURT
Chief Judge Kaye.
Under the New York adoption statute, a single person can adopt a child (Domestic Relations Law § 110). Equally clear is the right of a single homosexual to adopt (see, 18 NYCRR 421.16 [h] [2] [qualified adoption agencies "shall not * * * *656 reject[ ] [adoption petitions] solely on the basis of homosexuality”]). These appeals call upon us to decide if the unmarried partner of a child’s biological mother, whether heterosexual or homosexual, who is raising the child together with the biological parent, can become the child’s second parent by means of adoption.
 Because the two adoptions sought — one by an unmarried heterosexual couple, the other by the lesbian partner of the child’s mother — are fully consistent with the adoption statute, we answer this question in the affirmative. To rule otherwise would mean that the thousands of New York children actually being raised in homes headed by two unmarried persons could have only one legal parent, not the two who want them.
The Adoptions Sought
In Matter of Jacob, Roseanne M. A. and Jacob’s biological father (from whom she is divorced) separated prior to the child’s birth and Roseanne M. A. was awarded sole custody. Jacob was a year old when Stephen T. K. began living with him and his mother in early 1991. At the time of filing the joint petition for adoption three years later, Stephen T. K. was employed as a programmer/analyst with an annual income of $50,000, while Roseanne M. A. was a student at SUNY Health Center. Jacob’s biological father consented to the adoption.
Though acknowledging that "the granting of an adoption in this matter may be beneficial to Jacob,” Family Court dismissed the petition for lack of standing on the ground that Domestic Relations Law § 110 does not authorize adoptions by an unmarried couple. The Appellate Division affirmed, two Justices dissenting (210 AD2d 876), and an appeal to this Court was taken as of right.
In Matter of Dana, appellants are G. M. and her lesbian partner, P. I., who have lived together in what is described as a long and close relationship for the past 19 years. G. M. works as a special education teacher in the public schools earning $38,000 annually and P. L, employed at an athletic club, has an annual income of $48,000. In 1989, the two women decided that P. I. would have a child they would raise together. P. I. was artificially inseminated by an anonymous donor, and on June 6, 1990, she gave birth to Dana. G. M. and P. I. have shared parenting responsibilities since Dana’s birth *657 and have arranged their separate work schedules around her needs. With P. I.’s consent, G. M. filed a petition to adopt Dana in April 1993.
In the court-ordered report recommending that G. M. be permitted to adopt (see, Domestic Relations Law § 116), the disinterested investigator described Dana as an attractive, sturdy and articulate little girl with a "rich family life,” which includes frequent visits with G. M.’s three grown children from a previous marriage "who all love Dana and accept her as their baby sister.” Noting that G. M. "only has the best interest of Dana in mind,” the report concluded that she "provides her with a family structure in which to grow and flourish.”
As in Matter of Jacob, Family Court, while conceding the favorable results of the home study and "in no way disparaging the ability of [G. M.] to be a good, nurturing and loving parent,” denied the petition for lack of standing. In addition, the court held that the adoption was further prohibited by Domestic Relations Law § 117 which it interpreted to require the automatic termination of P. I.’s relationship with Dana upon an adoption by G. M. Despite its conclusion that G. M. had standing to adopt, the Appellate Division nevertheless affirmed on the ground that Domestic Relations Law § 117 prohibits the adoption (209 AD2d 8). We granted leave to appeal.
Limiting our analysis, as did the courts below, to the preserved statutory interpretation issues, we conclude that appellants have standing to adopt under Domestic Relations Law § 110 and are not foreclosed from doing so by Domestic Relations Law § 117. There being no statutory preclusion, we now reverse the order of the Appellate Division in each case and remit the matter to Family Court for a factual evaluation and determination as to whether these adoptions would be in the best interest of the children.
The Context of our Statutory Analysis
Two basic themes of overarching significance set the context of our statutory analysis.
First and foremost, since adoption in this State is "solely the creature of * * * statute” (Matter of Eaton, 305 NY 162, 165), the adoption statute must be strictly construed. What is to be construed strictly and applied rigorously in this sensitive area of the law, however, is legislative purpose as well as legislative language. Thus, the adoption statute must be applied in harmony with the humanitarian principle that adop *658 tian is a means of securing the best possible home for a child (see, Matter of Malpica-Orsini, 36 NY2d 568, 571-572).
Ten years ago, in Matter of Robert Paul P. (63 NY2d 233), we refused to allow the adoption of a 50-year-old man by his 57-year-old homosexual partner even though the statutory language permitted the adoption. Our refusal in Robert Paul P. rested solely on the fact that the adult adoption sought in that case would have been "wholly inconsistent with the underlying public policy of providing a parent-child relationship for the welfare of the child” (id., at 236).
The very next year, in Matter of Best (66 NY2d 151), we again chose not to construe the words of the adoption statute strictly, declining to permit an adopted child to inherit under the will of his biological grandmother because "[powerful policy considerations militate against construing a class gift to include a child adopted out of the family” (id., at 155). One commentator has characterized our decision in Best as "in defiance of * * * the text of the Domestic Relations Law * * * yet in accordance with current societal views of adoption and the adoptive relationship” (Note, When Blood Isn’t Thicker Than Water: The Inheritance Rights of Adopted-Out Children in New York, 53 Brooklyn L Rev 1007).
What Matter of Robert Paul P. and Matter of Best underscore is that in strictly construing the adoption statute, our primary loyalty must be to the statute’s legislative purpose— the child’s best interest. "The adoptive family arises out of the State’s concern for the best interest of the child” (People ex rel. Sibley v Sheppard, 54 NY2d 320, 327). This profound concern for the child’s welfare is reflected in the statutory language itself: when "satisfied that the best interests of the * * * child will be promoted thereby,” a court "shall make an order approving the adoption” (Domestic Relations Law § 114 [emphasis added]).
This policy would certainly be advanced in situations like those presented here by allowing the two adults who actually function as a child’s parents to become the child’s legal parents. The advantages which would result from such an adoption include Social Security and life insurance benefits in the event of a parent’s death or disability, the right to sue for the wrongful death of a parent, the right to inherit under rules of intestacy (see, In re Tammy, 416 Mass 205, 619 NE2d 315, 320) and eligibility for coverage under both parents’ health insurance policies. In addition, granting a second par *659 ent adoption further ensures that two adults are legally entitled to make medical decisions for the child in case of emergency and are under a legal obligation for the child’s economic support (see, Domestic Relations Law § 32).
Even more important, however, is the emotional security of knowing that in the event of the biological parent’s death or disability, the other parent will have presumptive custody, and the children’s relationship with their parents, siblings and other relatives will continue should the coparents separate. Indeed, viewed from the children’s perspective, permitting the adoptions allows the children to achieve a measure of permanency with both parent figures and avoids the sort of disruptive visitation battle we faced in Matter of Alison D. v Virginia M. (see, 77 NY2d 651, 656 ["Petitioner concedes that she is not the child’s 'parent’ * * * by virtue of an adoption.”]).
A second, related point of overriding significance is that the various sections comprising New York’s adoption statute today represent a complex and not entirely reconcilable patchwork. Amended innumerable times since its passage in 1873, the adoption statute was last consolidated nearly 60 years ago, in 1938 (L 1938, ch 606). Thus, after decades of piecemeal amendment upon amendment, the statute today contains language from the 1870’s alongside language from the 1990’s.
Though courts surely must, and do, strive to give effect to every word of a statute, our analysis must recognize the difficulty — perhaps unique difficulty — of such an endeavor here. With its long, tortuous history, New York’s adoption statute today is a far cry from a "methodical[ ] and meticulous[ ]” expression of legislative judgment (dissenting opn, at 683). That the questions posed by these appeals are not readily answerable by reference to the words of a particular section of the law, but instead require the traditional and often close and difficult task of statutory interpretation is evident even in the length of today’s opinions — whichever result is reached.
Against this backdrop, we turn to the particular provisions at issue.[1]
*660 Domestic Relations Law § 110
Despite ambiguity in other sections, one thing is clear: section 110 allows appellants to become adoptive parents. Domestic Relations Law § 110, entitled "Who May Adopt,” provides that an "adult unmarried person or an adult husband and his adult wife together may adopt another person” (Domestic Relations Law § 110). Under this language, both appellant G. M. in Matter of Dana and appellant Stephen T. K. in Matter of Jacob, as adult unmarried persons, have standing to adopt and appellants are correct that the Court’s analysis of section 110 could appropriately end here.[2]
Endowing the word "together” as used in section 110 with the overpowering significance of enforcing a policy in favor of marriage (as the dissent does) would require us to rewrite the statute. The statute uses the word "together” only to describe married persons and thus does not preclude an unmarried person in a relationship with another unmarried person from adopting. Rather, by insisting on the joint consent of the married persons, the statutory term "together” simply insures that one spouse cannot adopt a child without the other spouse’s knowledge or over the other’s objection (see, L 1984, ch 218, Mem of State Dept of Social Services, 1984 McKinney’s Session Laws of NY, at 3184). Since each of the biological mothers here is not only aware of these proceedings, but has expressly consented to the adoptions, section 110 poses no statutory impediment.[3]
The conclusion that appellants have standing to adopt is also supported by the history of section 110. The pattern of *661 amendments since the end of World War II evidences a successive expansion of the categories of persons entitled to adopt regardless of their marital status or sexual orientation. The language in section 110 permitting adoptions by "an adult or minor husband and his adult or minor wife together,” for example, is the result of 1951 legislation intended to enlarge the class of potential adoptive parents to include minors (Bill Jacket, L 1951, ch 211, Mem of Assn of Bar of City of NY, Committee on State Legislation, at 119; 1943 Opns Atty Gen 260). The sponsors of the bill, passed during the Korean War, were concerned that the child of a young father drafted into the military would be unable to take his father’s surname (Bill Jacket, L 1951, ch 211, Mem of Legal Aid Society, at 9).
Another illustration of such expansion is the 1984 amendment increasing the number of potential adoptive parents by permitting adoption by adults not yet divorced but living apart from their spouses pursuant to separation agreements. Supporting that amendment was New York’s "strong policy of assuring that as many children as possible are adopted into suitable family situations” (Bill Jacket, L 1984, ch 218, Mem of Dept of Social Services, at 2 [June 19, 1984]). As explained, the amendment
"would further this policy by requiring prospective adoptive parents to be evaluated on the basis of their ability to provide appropriate care, parental guidance and the security of a permanent home and not on their marital status alone. * * * [T]he marital status of a person should have no predetermined effect on the ability of that person to provide appropriate care to an adopted child” (id.).
Consistent with this trend, the latest amendment to Domestic Relations Law § 110 further increased the number of potential adoptive parents by permitting adoptions by nondivorced adults who have lived apart from their spouses for 18 months (L 1991, ch 254).
These amendments reflect some of the fundamental changes that have taken place in the makeup of the family. Today, for example, at least 1.2 of the 3.5 million American households which consist of an unmarried adult couple have children under 15 years old, more than a six-fold increase from 1970 (see, Current Population Reports, Population Characteristics, US Bur of Census, Marital Status & Living Arrangements, P20-478, at IX [1993]). Yet further recognition of this transfer- *662 motion is evidenced by the fact that unlike the States of New Hampshire and Florida (NH Rev Stat Annot § 170-B:4; Fla Stat Ann § 63.042 [3]), New York does not prohibit adoption by homosexuals. Indeed, as noted earlier, an administrative regulation is in place in this State forbidding the denial of an agency adoption based solely on the petitioner’s sexual orientation (18 NYCRR 421.16 [h] [2]).
A reading of section 110 granting appellants, as unmarried second parents, standing to adopt is therefore consistent with the words of the statute as well as the spirit behind the modern-day amendments: encouraging the adoption of as many children as possible regardless of the sexual orientation or marital status of the individuals seeking to adopt them.
Domestic Relations Law § 117
Appellants having standing to adopt pursuant to Domestic Relations Law § 110, the other statutory obstacle relied upon by the lower courts in denying the petitions is the provision that "[a]fter the making of an order of adoption the natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child or to his property by descent or succession” (Domestic Relations Law § 117 [1] [a]). Literal application of this language would effectively prevent these adoptions since it would require the termination of the biological mothers’ rights upon adoption thereby placing appellants in the "Catch-22” of having to choose one of two coparents as the child’s only legal parent.
As outlined below, however, neither the language nor policy underlying section 117 dictates that result.
The Language of Section 117. Both the title of section 117 ("Effect of adoption”) and its opening phrase ("After the making of an order of adoption”) suggest that the section has nothing to do with the standing of an individual to adopt, an issue treated exclusively in section 110 (see, at 660-662, supra). Rather, section 117 addresses the legal effect of an adoption on the parties and their property.
Also plain on the face of section 117 is that it speaks principally of estate law. Words such as "succession,” "inheritance,” "decedent,” "instrument” and "will” permeate the statute. Read contextually, it is clear that the Legislature’s chief concern in section 117 was the resolution of property disputes upon the death of an adoptive parent or child. As we observed in People ex rel. Sibley v Sheppard (54 NY2d 320, *663 supra), where we declined to read section 117’s termination language "overbroadly * * * [to] interfere with the court’s ability to protect the best interest of the child” and thereby prohibit visits with the child’s biological grandparents, the "bulk of the statute refers to intestacy and succession” (54 NY2d, at 325). Thus, from the very beginning of what is now section 117, both the scholarly commentary about the section and its dozen or so amendments have centered on issues of property rights and inheritance (see, e.g., L 1896, ch 272, § 64 [terminating right of biological parents to inherit from child, while allowing child to inherit from biological parents]; Second Report of Temporary St Commn on Modernization, Revision and Simplification of Law of Estates, Intestate Succession and the Adopted Child, 1963 NY Legis Doc No. 19, Report No. 1.2C, at 148; Comment, Judicial Limitations on the Rights of Adopted Children to Inherit from Their Natural Relatives as Issue, 60 St John’s L Rev 329 [1986]).
It is of course true that this Court, in a 1937 case rejecting claims for support brought by a destitute adopted adult daughter against her biological father, interpreted the then-applicable version of section 117 as "mak[ing] the adopted child the natural child of the adoptive parent” and "relieving] the natural parent from any responsibility for his child’s support” (Betz v Horr, 276 NY 83, 87, 88). The version of section 117 in effect at that time, however, did not contain current subdivision (1) (i), which, on its face, appears to limit the applicability of the entire first half of section 117 — including the language concerning termination in subdivision (1) (a) — "only to the intestate descent and distribution of real and personal property” (Domestic Relations Law § 117 [1] [i] [emphasis added]).
Obviously, one cannot invoke the termination language in subdivision (1) (a) in its most literal sense and at the same time reject a literal application of the above-quoted language in subdivision (1) (i). A strict construction of the entire section would lead to the incongruous result that the termination language of subdivision (1) (a) is relevant only when there is a dispute as to intestate succession.
Significantly, the language in subdivision (1) (i) was added only recently (L 1986, ch 408), after the promulgation of the regulations providing that neither marital status nor sexual orientation may alone be determinative in an adoption proceeding (18 NYCRR 421.16 [h] [2]). In recommending passage of the 1986 amendment, the Law Revision Commission warned that:
"In distinguishing between various classes of adopted-out children, the Commission must base different treatment of some children on factors *664 which do not result in discrimination against certain classes of persons (e.g., nonmarital children, unwed parents, males, females) in a manner impermissible under the Equal Protection Clause * * * of the United States * * * 0r * * * New York State Constitution” (1986 Report of NY Law Rev Commn, 1986 McKinney’s Session Laws of NY, at 2581).
This admonition indicates a concern that an unduly restrictive reading of section 117 could have the discriminatory and unintended effect of making unwarranted, detrimental distinctions between "nonmarital children” like the two children here and those children whose parents are married.
Given this warning, as well as the anomaly created by an unnecessarily literal reading of the statute, we conclude that neither subdivision (1) (a) nor subdivision (1) (i) was intended to have universal application.
Recent Statutory Amendments. Moving beyond the language and history of section 117 itself, our reading of the statute is further supported by recent amendments to other sections of the adoption law which provide elaborate procedural mechanisms for regulating the relationships between the child, the child’s (soon-to-be former) biological parents and the persons who will become the child’s parents upon adoption (see, Social Services Law § 383-c; Domestic Relations Law § 115-b).
In the context of agency adoptions, Social Services Law § 383-c, enacted in 1990 (L 1990, ohs 479, 480), provides that biological parents willing to give their child up for adoption must execute a written instrument, known as a "surrender,” stating "in conspicuous bold print on the first page” that "the parent is giving up all rights to have custody, visit with, write to or learn about the child, forever” (Social Services Law § 383-c [5] [b] [ii]).
The second category of adoption — private placement — is also regulated by a newly revised statute (L 1986, ch 817) requiring the execution of a written "consent” stating that "no action * * * may be maintained * * * for the custody of the child” (Domestic Relations Law § 115-b [1]). In fact, the procedure mandated by Domestic Relations Law § 115-b closely parallels that of Social Services Law § 383-c. Both statutes, for example, require biological parents to execute a document that effectively terminates parental rights. Both provisions require a *665 Judge or Surrogate (if the document is executed in court) to inform the biological parents of the consequences of their act, and advise them of their right to be represented by counsel (Social Services Law § 383-c [5] [b]; Domestic Relations Law § 115-b [2] [b]). More importantly, both statutes provide generally that the biological parents’ "surrender” or "consent” may be revoked within 45 days, and that an adoption proceeding may not be commenced until after the expiration of that period (Social Services Law § 383-c [8] [b]; Domestic Relations Law § 115-b [4] [d]). Thus, by the time the adoptive parents become the child’s legal parents, the biological parents have already formally agreed to relinquish their relationship with the child.
The procedural safeguards contained in Social Services Law § 383-c and Domestic Relations Law § 115-b — safeguards that reflect modern sensitivities as to the level of procedural protection required for waiver of parental rights — further indicate that section 117 does not invariably mandate termination in all circumstances. Under the language of section 117 alone, a biological mother’s rights could theoretically be severed unilaterally, without notice as to the consequences or other procedural protections. Though arguably adequate in 1938 when the statute was enacted (L 1938, ch 606, § 1; cf., Matter of Bistany, 239 NY 19 [Cardozo, J.]), such a summary procedure would be unlikely to pass muster today (see, e.g., Santosky v Kramer, 455 US 745, 768-770; Matter of Sarah K., 66 NY2d 223, 237).
The above-described amendments to Social Services Law § 383-c and Domestic Relations Law § 115-b suggest that the Legislature in recent years has devised statutory vehicles other than section 117 to carefully regulate and restrict parental rights during the adoption process, again militating against a rigid application of subdivision (1) (a).
The Ambiguity Should Be Resolved in the Children’s Favor. Finally, even though the language of section 117 still has the effect of terminating a biological parent’s rights in the majority of adoptions between strangers — where there is a need to prevent unwanted intrusion by the child’s former biological relatives to promote the stability of the new adoptive family— the cases before us are entirely different. As we recognized in Matter of Seaman (78 NY2d 451, 461), "complete severance of the natural relationship [is] not necessary when the adopted person remain[s] within the natural family unit as a result of an intrafamily adoption.”
One example of an adoption where the Legislature has explicitly acknowledged that termination is unwarranted is *666 when the child, with the consent of the biological parent, is adopted by a "stepparent” (Domestic Relations Law § 117 [1] [d]). A second, implicit exception occurs in the adoptions by teenage fathers authorized by the 1951 amendment to section 110 (see, at 661, supra). Since minor fathers adopting their own biological children are not "stepparents” under the language of Domestic Relations Law § 117 (1) (d), they would be prohibited from adopting were section 117’s termination language to be mandatory in all cases. The seemingly automatic cut-off language of section 117 could not have been intended to bar these adoptions, however, since they are precisely what the Legislature sought to encourage in the first place.
Yet a third class of adoptions where complete termination of parental rights appears to be contrary to legislative intent are those adoptions contemplated by Social Services Law § 383-c, a completely new statute enacted five years ago. Specifically, New York law now allows the parties to an agency adoption to "agree to different terms” as to the nature of the biological parents’ postadoptive relationship with the child. The statute thus expressly permits parties to agree that the biological parent will retain specified rights — such as visitation with the child — after the adoption, thereby authorizing "open adoptions” for the first time in this State (see, Carrieri, Supplementary Practice Commentaries, McKinney’s Cons Laws of NY, Book 52A, Social Services Law § 383-c, 1995 Cum Ann Pocket Part, at 69).
A year prior to the enactment of Social Services Law § 383-c, this Court declined to sanction the concept of "open adoption” because of our belief that it was inconsistent with what we perceived to be section 117’s requirement that termination of parental rights was mandatory in all cases (Matter of Gregory B., 74 NY2d 77, 91 [citations omitted]). Significantly, when enacting Social Services Law § 383-c the very next year, the Legislature saw no need to amend Domestic Relations Law § 117. Again, if section 117 automatically terminated parental rights in all circumstances, it would have the practical effect of overriding the conditional surrender/’’open adoption” provisions of Social Services Law § 383-c. By passing Social Services Law § 383-c as it did, the Legislature thus necessarily rejected the reading of section 117 articulated in Matter of Gregory B. (see, People ex rel. Sibley v Sheppard, 54 NY2d 320, 325, supra).
Given the above, it is plain that an interpretation of section 117 that would limit the number of beneficial intrafamily adoptions cannot be reconciled with the legislative intent to authorize open adoptions and adoptions by minors. The coexis *667 tence of the statute’s seemingly automatic termination language along with these more recent enactments creates a statutory puzzle not susceptible of ready resolution.
One conclusion that can be drawn, however, is that section 117 does not invariably require termination in the situation where the biological parent, having consented to the adoption, has agreed to retain parental rights and to raise the child together with the second parent. Despite their varying factual circumstances, each of the adoptions described above — stepparent adoptions, adoptions by minor fathers and open adoptions — share such an agreement as a common denominator. Because the facts of the cases before us are directly analogous to these three situations, the half-century-old termination language of section 117 should not be read to preclude the adoptions here. Phrased slightly differently, "the desire for consistency in the law should not of itself sever the bonds between the child and the natural relatives” (People ex rel. Sibley v Sheppard, 54 NY2d 320, 326, supra).[4]
"Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results” (Kauffman & Sons Saddlery Co. v Miller, 298 NY 38, 44 [Fuld, J.]; see also, McKinney’s Cons Laws of NY, Book 1, Statutes § 150). Given that section 117 is open to two differing interpretations as to whether it automatically terminates parental rights in all cases, a construction of the section that would deny children like Jacob and Dana the opportunity of having their two de facto parents become their legal parents, based solely on their biological mother’s sexual orientation or marital status, would not only be unjust under the circumstances, but also might raise constitutional concerns in light of the adoption statute’s historically consistent purpose — the best interests of the child. (See, e.g., Gomez v Perez, 409 US 535, 538 [Equal Protection Clause prevents unequal treatment of children whose parents are unmarried]; Plyler v Doe, 457 US 202, 220 [State may not direct the onus of parent’s perceived "misconduct against his (or her) children”]; Matter of Bums v Miller Constr., 55 NY2d 501, 507-510 [New York statute requiring child born out of wedlock to prove "acknowl *668 edgment” by deceased parent did not further legitimate State interest]; see also, Matter of Best, 66 NY2d 151, 160, n 4, supra).[5]
These concerns are particularly weighty in Matter of Dana. Even if the Court were to rule against him on this appeal, the male petitioner in Matter of Jacob could still adopt by marrying Jacob’s mother. Dana, however, would be irrevocably deprived of the benefits and entitlements of having as her legal parents the two individuals who have already assumed that role in her life, simply as a consequence of her mother’s sexual orientation.
Any proffered justification for rejecting these petitions based on a governmental policy disapproving of homosexuality or encouraging marriage would not apply. As noted above, New York has not adopted a policy disfavoring adoption by either single persons or homosexuals. In fact, the most recent legislative document relating to the subject urges courts to construe section 117 in precisely the manner we have as it cautions against discrimination against "nonmarital children” and "unwed parents” (see, at 664, supra). An interpretation of the statute that avoids such discrimination or hardship is all the more appropriate here where a contrary ruling could jeopardize the legal status of the many New York children whose adoptions by second parents have already taken place (e.g., Matter of Camilla, 163 Misc 2d 272; Matter of Evan, 153 Misc 2d 844; Matter of A. J. J., 108 Misc 2d 657).
Conclusion
To be sure, the Legislature that last codified section 117 in 1938 may never have envisioned families that "include[ ] two adult lifetime partners whose relationship is * * * character *669 ized by an emotional and financial commitment and interdependence” (Braschi v Stahl Assocs. Co., 74 NY2d 201, 211). Nonetheless, it is clear that section 117, designed as a shield to protect new adoptive families, was never intended as a sword to prohibit otherwise beneficial intrafamily adoptions by second parents.
Accordingly, in each proceeding, the order of the Appellate Division should be reversed, without costs, the adoption petition reinstated and the matter remitted to Family Court for further proceedings consistent with this opinion.

. The dissent’s criticisms of our reasoning and methodology are unfounded and undeserved. A careful process of studying the various statutes and their history, in an effort to resolve the novel questions presented, has led us to different conclusions — not unlike courts elsewhere that have confronted this issue and in the main have resolved it as we have (see, In re *660 Tammy, 416 Mass 205, 619 NE2d 315 [1993], supra [permitting second parent adoption]; In re B.L.V.B., 160 Vt 368, 628 A2d 1271 [1993] [permitting second parent adoption]; In re M.M.D., 662 A2d 837 [DC 1995] [permitting second parent adoption]; but see, In re Angel Lace M., 184 Wis 2d 492, 516 NW2d 678 [1994]).

. Though the adoption petition in Matter of Jacob was filed jointly on behalf of appellant Stephen T. K. and Jacob’s biological mother in "an understandable effort to cover all the bases” (In re M.M.D., 662 A2d 837, 843, supra), the fact that appellants chose this procedural route should not preclude Stephen T. K. — an adult unmarried person — from adopting Jacob.

. By interpreting the language regarding married couples in section 110 as expansively as it does, the dissent would prohibit adoptions in whole categories of cases not before us — for example, when two unmarried adults seek to adopt a child who is the biological child of neither of them (see, e.g., In re M.M.D., 662 A2d 837, supra) — thereby decreasing the number of persons eligible to adopt children deemed "hard-to-place” due to circumstances such as behavioral problems, birth defects or serious illnesses.

. The two appeals before us concern adoptions by second parents, not adoptions by "any number of people who choose to live together” (dissenting opn, at 672-673). Similarly, our decision today does not mandate judicial approval of second parent adoptions in all situations, but simply permits them to take place when appropriate (see, Domestic Relations Law § 114).

. This long-standing and widely recognized principle of statutory construction is invoked merely as an additional interpretive aid — a pathway of analysis — in the difficult task of choosing among possible readings of a statute (see, Matter of Lorie C., 49 NY2d 161, 171; International Fuel & Iron Corp. v Donner Steel Co., 242 NY 224, 231). In answering the question posed —what does the statute mean? — we use all available and appropriate analytical tools.
Despite the dissent’s assertions to the contrary, we are not declaring section 117 unconstitutional, but instead interpreting it in a practical, commonsense manner which conserves judicial resources and avoids the awkward alternative of "giving [it] an interpretation which might precipitate embarrassing constitutional questions” in the future (Hovey v Be Long Hook & Eye Co., 211 NY 420, 429; see also, Matter of Cipolla v Golisano, 84 NY2d 450, 455).