Matter of Mary M.O. v Doe (2006 NY Slip Op 52069(U))

[*1]

Matter of Mary M.O. v Doe

2006 NY Slip Op 52069(U) [13 Misc 3d 1230(A)]

Decided on October 25, 2006

Family Court, Suffolk County

Simeone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 25, 2006

Family Court, Suffolk County
In the Matter of the Enforcement of a Judicial Surrender, Mary M.O., Petitioner(s),
 against
Jane Doe [Adoptive Parent], Respondent(s).
AS-18166-04/06B

Petitioner's Attorney:
Richard M. Gold, Esq.
1690 Washington Ave., Suite 3
Bohemia, NY 11716
Respondent's Attorney:
Steven Flaumenhaft, Esq.
Sayville, NY 11796
Law Guardian:
Jane Bernstein, Esq.
Law Guardian Bureau
400 Carleton Avenue
Central Islip, NY 11722
County Attorney:
Michael Heiser, Esq.
400 Carleton Avenue
Central Islip, NY 11722

Ettore Simeone, J.
Petitioner, Mary M.O., filed application dated March 29, 2006, seeking enforcement of the terms of the Judicial Surrender dated October 13, 2004, wherein she agreed to relinquish her parental rights to the child Rebecca O., d.o.b. 2/4/99. Petitioner alleges that the terms of the surrender which provided that "petitioner was to receive four visits per year at reasonable intervals with the child and be entitled to cards, letters and pictures" were violated in that the Department of Social Services (hereinafter referred to as "D.S.S.") has failed to respond to her request for additional visitation since her last visit with the child in November of 2004. The Court conducted a hearing on petitioner's application on July 5, 2006, August 18, 2006, September 26, 2006 and September 29, 2006.
Fact-Finding
Ms. Jamie Jacobs of D.S.S., testified that she was the caseworker assigned to petitioner between November of 2004 and March of 2005, after petitioner agreed to the judicial surrender of the child, Rebecca on October13, 2004. Ms. Jacobs indicated that she was contacted by petitioner, in November of 2004, to arrange for visitation with Rebecca. Ms. Jacobs stated that she was present for the November visitation which occurred at the D.S.S. offices and that petitioner played with the child during visitation but did not display "overt attachment" nor was she "overly affectionate". Further, Ms. Jacobs stated that she was "unsure" of the effect of the visit on the child, but that the child did not seem to recognize respondent as her mother, nor was any "bond" between them evident.
Ms. Jacobs testified that the Foster Mother (hereinafter referred to as "Jane Doe") did not object to the November visitation between petitioner and the child but that when she called Jane Doe in December of 2004 to arrange for visitation, Jane Doe told her that the child was "freed for adoption" and that she believed that once the adoption was finalized, the condition of visitation was no longer valid. Further, Ms. Jacobs stated that Jane Doe asked her why petitioner was still entitled to visitation after she surrendered her parental rights. Ms. Jacobs stated that she explained to Jane Doe that the conditions of the surrender were still valid even after the adoption was finalized. Ms. Jacobs also indicated that she spoke to her supervisor who told her that Jane Doe had agreed to the condition that petitioner receive four visits per year with the child at the time of the surrender and prior to the time the adoption was finalized.Ms. Jacobs also stated that Jane Doe discussed plans to relocate with the child and inquired as to whether the visitation would interfere with her relocation. Jane Doe did not however indicate the place of her intended relocation, but the caseworker told her that despite her plans to relocate, visitation would still have to take place.
Ms. Jacobs stated that petitioner contacted her for visitation in February of 2005, and that she notified caseworker, Donna Vitale, to follow-up with petitioner's request for visitation.
Petitioner, Mary O. testified that for the first six months to a year following the judicial surrender of Rebecca, she called Child Protective Services (hereinafter referred to as "C.P.S.") repeatedly, two to three times per day, without receiving any response. Petitioner stated that she last visited with the child in November of 2004 and was told that it was her "last visit". Petitioner indicated that at a certain point she "gave up" on calling C.P.S. because they never [*2]returned her phone calls and that's when she turned to her attorney, Mr. Gold, for assistance. Petitioner testified that she subsequently found out the child was adopted from her eldest daughter Catherine and not from C.P.S. and last spoke with a caseworker in February of 2005. Additionally, respondent indicated that she was never told about "the new" caseworker, Donna Vitale, but heard about her through her daughter, Jessica. Petitioner claimed that she has had "twenty to thirty" caseworkers assigned to her over the years.
Petitioner testified that not only was she denied visitation in accordance with the terms of surrender, she never received cards, photographs or letters from the child or Jane Doe either. Petitioner explained that she has never sent any photos or letters to the child because she does not know where to send them. Petitioner stated that she has no intention of "undoing" the adoption but wants to enforce the visitation so that she can see the child and "let her know that I still love her and think about her." While petitioner admits that she gave up her rights to a "mother-child" relationship with Rebecca, she stated that she still wants to see her four times per year, as agreed upon in the conditional surrender. Prior to the surrender, petitioner stated that she was supposed to see Rebecca every week, but probably saw her two times per month, due to problems with transportation or illness of the child. Petitioner stated that when she last saw Rebecca in November of 2004 , the child referred to her as "Mary" and told her that "you're not my mother."On cross-examination, petitioner admitted that during the period between February and March of 2005 she called Ms. Jacobs twice.
Denise Randazzo testified that she works in the Foster Care Bureau and has been with D.S.S. for the past fifteen years and that she was the senior caseworker assigned to petitioner. Ms. Randazzo stated that she spoke with Jane Doe on the day of the surrender and told her that the surrender was conditional upon petitioner receiving visitation and correspondence with respect to the child, but she did not recall discussing the amount of visitation agreed to or how long the conditions were to last. Ms. Randazzo indicated that Jane Doe asked her if she could still adopt Rebecca and "that she would agree to whatever it would take to free Rebecca for adoption." Ms. Randazzo stated that she had no further communication with Jane Doe after the judicial surrender occurred.
On cross-examination, Ms. Randazzo admitted that she did not take notes regarding the conversation she had with Jane Doe on the day of the surrender, but that she did report the conversation to D.S.S. Assistant Director Tim Ferguson. She indicated that their conversation lasted between five and ten minutes.
Jane Doe testified that petitioner had been visiting with the child for one hour per week sometime around June of 2001 and that there was "a gap" in visitation for approximately one to one and a half years during which petitioner did not visit with the child. After that visitation between petitioner and the child resumed but was "sporadic" and for a year to a year and a half prior to the judicial surrender, petitioner was visiting with the child two or three times per month. Jane Doe claimed that when the child was four year old, she was afraid of petitioner because petitioner told her "she was going to go home with her". Jane Doe described petitioner's behavior during visitation as "inappropriate" and described an incident in which petitioner "opened the back door of the truck and hugged Rebecca". Jane Doe stated that after that incident she stopped bringing Rebecca for visitation.Additionally, Jane Doe indicated that Rebecca "knows she's adopted" and does not question her about her biological mother or father.
Jane Doe further stated that she was never notified of the "conditions" upon which [*3]petitioner surrendered her parental rights to Rebecca and was not told that visitation was to continue after the adoption occurred. Jane Doe claimed that when she attended a meeting on November 3, 2004 with D.S.S. regarding the details of the adoption of Rebecca, that there was no discussion of the judicial surrender or petitioner's visitation rights. Jane Doe claims that she hadn't seen the judicial surrender until April of 2006. While the foster mother indicated that she had an attorney at the time of the adoption, she claims that the judicial surrender was not part of the packet of papers submitted at the time of the adoption.
When Ms. Jacobs was called as a rebuttal witness she testified that she met with Jane Doe on November 3, 2004, when she came to sign some paperwork regarding her intention to adopt Rebecca. Ms. Jacobs stated that the meeting was brief and that the adoption process was discussed. While there were no meetings scheduled after that, she indicated that she spoke to the Jane Doe on the phone on several occasions concerning the conditions of the surrender, but never gave her a copy of it.
While Jane Doe recalls that Ms. Jacobs was a caseworker at the time of the surrender, she does not recall speaking with her in December of 2004 as Ms. Jacobs had claimed. Jane Doe admitted that she spoke with "someone" from D.S.S. on the day of the surrender but that she was only told that Rebecca was being "freed for adoption". Further, Jane Doe stated that she would not have agreed to continued visitation between petitioner and Rebecca because it's "unhealthy" for the child and that she thought that the visitation that occurred between petitioner and Rebecca in November of 2004 was to be the last.
Donna Vitale, a caseworker with D.S.S., was assigned to work with Rebecca in June of 2001. Ms. Vitale observed three or four visits, the last in 2002, and described visitation as "chaotic". Ms. Vitale indicated that the children played individually or together, but that there was not much interaction between Rebecca and petitioner. She stated that Rebecca seemed upset about going to visit petitioner and only went to see her siblings, but admitted that she never witnessed petitioner doing anything "improper". Ms. Vitale was not aware of the visitation that occurred in 2004, because she was out on maternity leave at the time.
Ms. Vitale testified that in March of 2005, she conducted a home visit with Jane Doe. At that time she told Jane Doe that petitioner had called twice and said that she had not seen Rebecca in months and wanted to schedule a visitation. Ms. Vitale stated that Jane Doe told her that she would try to arrange a "sibling visit", but that she had not done so yet because Rebecca gets "upset" about the visitations. Ms. Vitale testified that they did not discuss the conditions of the surrender. Ms. Vitale indicated that the adoption of the child by Jane Doe was finalized on April 8, 2005, at which point, D.S.S. closed its case.
Legal Analysis
Petitioner, Mary M. O., brought the instant petition seeking enforcement of the terms and conditions of the judicial surrender dated October 13, 2004, in which she relinquished her parental rights to the child Rebecca O., d.o.b. 2/4/99. The Court with due and careful deliberation, has reviewed the evidence presented and finds that the terms and conditions of the judicial surrender have been violated, in that petitioner has not been afforded visitation or correspondence in accordance with the terms therein, which provide that she be permitted four visits per year in addition to cards, letters and photographs.
Social Services Law sec. 383-c "allows parties to an agency adoption to agree to different terms' as to the nature of the biological parents' post-adoptive relationship with the [*4]child. The statute expressly permits parties to agree that the biological parent will retain specified rights such as visitation with the child after the adoption, thereby authorizing open adoptions.'" In the Matter of Jacob, 86 NY2d 651, 666, 636 NYS2d 716 (1995).
There is no dispute as to the language of the judicial surrender in that it clearly and unequivocally permits petitioner to visit with Rebecca four times a year. (Petitioner's Exhibit "1") Both petitioner and Ms. Jacobs of the D.S.S. testified that petitioner's last visit with the child was in November of 2004. Petitioner further testified that after her last visit, she called D.S.S. repeatedly in attempts to schedule additional visitation with Rebecca, but that no
one returned her calls. Both Ms. Jacobs and Donna Vitale of D.S.S. testified that petitioner had called to request further visitation, and Ms. Vitale admitted that she spoke to the Jane Doe regarding petitioner's requests.
There is some dispute as to whether the Jane Doe was aware that the judicial surrender entered into between petitioner and D.S.S was conditioned upon petitioner's right to continued visitation after the adoption was finalized. While it is not dispositive of the determination herein, the Court finds that the Jane Doe was in fact informed of the conditions of surrender. Ms. Jacobs testified that she spoke with Jane Doe after the November of 2004 visitation and told her that the conditions of surrender, including that of visitation, were valid, even after the surrender occurred. Further, Ms. Jacobs stated that she spoke with her supervisor who confirmed that she had told Jane Doe that the surrender was conditioned upon continued visitation. Additionally, Ms. Randazzo of the Foster Care Bureau of D.S.S., testified that she spoke with Jane Doe on the day of the surrender and told her that the surrender was conditional upon petitioner receiving visitation and correspondence with the child. Ms. Randazzo stated that Jane Doe told her that "she would agree to whatever it takes to free Rebecca for adoption."
While Jane Doe claims that she believed visitation would terminate after the child was "freed for adoption", the evidence presented indicates that Jane Doe knew that petitioner surrendered her parental rights to Rebecca on the condition that she be entitled to continued visitation with the child. Further, petitioner's right to continued visitation with the child is not dependent upon whether or not Jane Doe was aware of the fact that visitation was to continue after the child was "freed for adoption". The Court in Matter of Ronald D. V. Jane DOE, 176 Misc 2d 567, 673 NYS2d 559 (Fam. Ct., Jefferson Co., NY 1998) held that:
"[T]he Department of Social Services cannot grant greater rights than it acquired. Pursuant to Social Services Law sec. 383-c, the child was placed into the care and custody of the agency under certain restrictions. The parent reserved the right to receive yearly photographs and reports concerning the children. Those rights were part of the contract between the parties, which is permitted by statute. "Jane Doe" was not a party to that agreement. She entered into a separate contract with the agency concerning one of the children. The agency has purported to release one of these children to "Jane Doe" without restriction, but the agency did not receive the child without restriction. The agency cannot give or grant what it did not receive."
Matter of Ronald D. V. Jane DOE, 176 Misc 2d at 570-571, 673 NYS2d at 562.
Similarly, petitioner's rights to continued visitation under the judicial surrender were not extinguished by any alleged failure on the part of D.S.S. to notify the Jane Doe of the conditions of the surrender. While the Court believes that D.S.S. had an obligation to disclose to Jane Doe [*5]the terms and conditions of a surrender, "Jane Doe" and her attorney had the obligation to review the surrender to inquire as to whether or not any terms or conditions existed." Id at 563.Further, as the Court stated in its order dated June 29, 2006, requirements to incorporate the terms and conditions of the judicial surrender into the order of adoption are a result of a legislative enactment effective on December 23, 2005, after the date the order of adoption was finalized in the instant case.
While the Court recognizes that Jane Doe's purported lack of knowledge concerning petitioner's rights to visitation do not invalidate the conditions contained in the surrender, continued visitation between petitioner and the child is subject to the Court's scrutiny for a determination as to whether continued visitation between the petitioner and the child is in the child's best interests.The legislature in enacting Social Services Law sec 383-c, "granted to the biological parent of a child in foster care who determined to free the child for adoption, the privilege to have standing to petition the court for continuing contact with the child post-adoption, where such privilege was explicitly reserved in the surrender. The controlling mandate of the court is always the best interest of the child." Adoption of Gerald T., 211 AD2d 17, 21, 625 NYS2d 509, 511 (1st Dept. 1995).
The Court finds that continued visitation between petitioner and the child, Rebecca, in accordance with the terms set forth in the judicial surrender, is in the best interests of the child. The Second Department in In the Matter of Corinthian Marie, 297 AD2d 382, 382, 746 NYS2d 606, 607 (2d Dept. 2002) held that "continued relations between a child and a natural parent may be in the child's best interests even after adoption." In the Matter of Corinthian Marie, 297 AD2d at 382, 746 NYS2d at 607. See also, In re Lovell Raeshawn, 308 AD2d 589, 591, 764 NYS2d 714, 716 (2d Dept. 2003).
In the instant case, the child is aware of the fact petitioner is her biological mother. Petitioner visited with the child approximately twice a month, while the child was in foster care and prior to the execution of the judicial surrender in October of 2004. The representatives of D.S.S. testified that while Rebecca did not seem particularly bonded to petitioner, petitioner never acted "inappropriately" during visitations. Since their last visit in November of 2004, petitioner repeatedly attempted to contact D.S.S. to schedule visitation and when D.S.S. failed to respond she filed the underlying violation petition to enforce the terms of the surrender.
Further, the Court finds that a cessation of visitation between the child and her biological mother may cause the child to suffer long term emotional distress due to feelings of abandonment. While visitation has been somewhat sporadic, continued visitation would convey a positive message to the child that her mother cares about her and desires continued contact. Additionally, the Law Guardian recommends that in the best interests of the child, visitation be continued.
While Jane Doe claims that petitioner has acted inappropriately during visitation, her testimony as to any specific improprieties was vague and unsupported by D.S.S. witnesses. Further, any contention that visitation should cease because child has not seen respondent in nearly two years, is wrought with inherent unfairness. Visitation was terminated, through no fault of petitioner, despite her repeated attempts to see the child. The Court believes that while D.S.S. did not properly follow-up with petitioner's requests for visitation, Jane Doe further frustrated visitation by her failure to cooperate. Any argument that petitioner's recent lack of contact with the child justifies the termination her rights under the surrender is without merit.
[*6]
Accordingly, this Court finds that the conditions of visitation and correspondence contained in the judicial surrender dated October 13, 2004 remain in full force and effect, entitling petitioner to four visits per year with the child and to further communication via cards, letters and pictures.
This constitutes the final order of the Court.
ENTER

HON. ETTORE SIMEONE
J.F.C.
Order Mailed:
Petitioner, Respondent,
Attorneys of record