Matter of John (Joseph G.) (2019 NY Slip Op 05132)





Matter of John (Joseph G.)


2019 NY Slip Op 05132


Decided on June 26, 2019


Appellate Division, Second Department


Scheinkman, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 26, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
HECTOR D. LASALLE
BETSY BARROS
ANGELA G. IANNACCI, JJ.


2018-06336
 (Docket No. A-17-18)

[*1]In the Matter of John. Joseph G. (Anonymous), appellant.



APPEAL by Joseph G., in an adoption proceeding pursuant to Domestic Relations Law article 7, from an order of dismissal of the Family Court (John M. Hunt, J.), dated March 20, 2018, and entered in Queens County. The order of dismissal, upon a decision of the same court, also dated March 20, 2018, dismissed the appellant's petition to adopt the subject child. The notice of appeal from the decision is deemed to be a notice of appeal from the order of dismissal (see CPLR 5512[a]).



Joseph G. (Anonymous), Fresh Meadows, NY, appellant pro se.



SCHEINKMAN, P.J.


OPINION & ORDER
The issue presented on this appeal is whether the biological father of a child conceived with an anonymous egg donor and born to a gestational surrogate may adopt the child and thereby terminate any parental rights held by the gestational surrogate. We determine that, under the circumstances presented by this case, the adoption may proceed. Contrary to the determination of the Family Court, the proposed adoption is authorized by the governing statute and is consistent with the underlying legislative purposes.
The Relevant Facts
The appellant is a single, gay man who, in 2012 and under medical supervision, had embryos created using his sperm and eggs from an anonymous egg donor. The egg donor relinquished all rights to the eggs and any resulting children. The appellant had some of the embryos implanted in an unpaid ("compassionate") gestational surrogate; the remaining embryos were frozen. In 2013, twins, a boy and a girl, were born. The appellant adopted them, obtaining an order of adoption from the Family Court.
In 2017, the appellant decided to add to his family, utilizing the remaining frozen embryos. A friend of his agreed to carry the embryos and entered into a surrogacy agreement with the appellant. They agreed that the appellant would adopt the child from the surrogate and thereby relieve her of any responsibility for the child. A fertility clinic implanted two embryos into the gestational surrogate. One embryo was unsuccessful. The other embryo resulted in the birth of the subject child, John, in October 2017. John has been in the care of the appellant since leaving the hospital after his birth.
The birth certificate lists the surrogate as the mother and does not list a father. The appellant filed a petition to adopt the child. The surrogate executed an extrajudicial consent, utilizing the statutorily-mandated form, to the adoption, surrendering her parental rights (see Domestic Relations Law §§ 111[1][c]; 115-b). The surrogate also submitted affidavits in which she described the circumstances of the child's conception and birth and averred that she voluntarily agreed to have the appellant be the sole parent of the child and that, in effect, there were no other persons who had, or claimed to have, any parentage rights with respect to the child.
An adoptive home study was conducted, with extremely positive findings. The social worker found the appellant to be a mature, stable, and caring person who intentionally created a family of himself, the twins, and John. John's adjustment appeared to be excellent, and it was clear that the appellant, his twins, and John are a cohesive family unit. Medical documentation and letters of reference were also submitted.
In a decision dated March 20, 2018, the Family Court stated that it was dismissing the adoption petition, since permitting the adoption would validate "a patently illegal surrogacy contract" and there was no authority for a parent to adopt his or her own biological child. The court reasoned that to permit a biological parent to adopt his or her own child would confer rights upon a parent which already existed, and thus the purpose of the adoption statute was not served. The court stated that the appellant had other means of being named John's legal father, such as an order of filiation, and stated that it would entertain such a petition. The petition was dismissed in a separate order of dismissal of the same date. This appeal ensued.
This Case Does Not Involve Validation or Enforcement of an Illegal Surrogacy Contract
The first reason given by the Family Court for its dismissal of the adoption petition was that it would not validate "a patently illegal surrogacy contract." This assertion is plainly erroneous.
It is true that New York's present public policy, unchanged since 1993 [FN1], is that all surrogate parenting contracts are against public policy and are void and unenforceable (see Domestic Relations Law § 122). Surrogate parent contracts are defined for this purpose to mean any agreement in which: (a) a woman agrees to be inseminated with the sperm of a man other than her husband or to be impregnated with an embryo that is the product of an ovum fertilized with sperm of a man other than her husband; and (b) the woman agrees to, or intends to, surrender or consent to the adoption of the child born as the result of such insemination or impregnation (see Domestic Relations Law § 121[4]). An agreement to pay compensation is not part of the statutory definition. Hence, a surrogate parenting contract is void as against public policy even where no payment of funds is involved. The agreement made by the appellant in this case with the gestational surrogate is within the statutory proscription. However, that does not end the discussion.
Apart from the general policy directive that surrogate parenting contracts are void and unenforceable, the Legislature has restricted active measures for a one-time violation of the expressed public policy to the imposition of civil penalties only and, even at that, only as against those involved in commercial surrogacy contracts. A civil monetary penalty is to be assessed against parties to a commercial surrogacy contract, as well as against persons who induce, arrange, or otherwise assist in the formation of such contracts (see Domestic Relations Law § 123). Where a birth mother or her husband, a genetic father and his wife, or a genetic mother and her husband pay compensation in connection with a surrogate parenting contract, each is subject to a civil penalty of up to $500 (see Domestic Relations Law § 123[2][a]). The penalty is far more severe for those who arrange such contracts for profit. A first offense is punished by a civil penalty of up to $10,000 and forfeiture to the State of the fee or other compensation paid to the arranger (see Domestic Relations Law § 123[2][b]). A second offense committed by an arranger who has already been subject to the civil penalty is punishable as a felony (see id.).
A commercial surrogacy contract is one in which a party receives from, or pays a fee to, the other party, as well as one in which someone is paid for inducing, arranging, or assisting in the formation of the contract (see Domestic Relations Law § 123[1]). The penalty provisions do not apply where the only monies paid are either: (a) the type of payments that may appropriately be made in connection with adoption proceedings and which are disclosed in affidavits required by the adoption statute (see Domestic Relations Law § 115); and (b) payments for reasonable and actual medical fees and hospital expenses for artificial insemination or in vitro fertilization services incurred by the mother in connection with the birth of the child (see Domestic Relations Law § 123[1]).
Parties to a surrogacy contract which does not involve the payment of proscribed [*2]compensation are not subject to any civil or criminal penalty. Thus, the Legislature, while rendering all surrogate parenting agreements void as against public policy, has drawn a distinction between commercial surrogacy contracts and noncommercial surrogacy contracts. While commercial surrogacy contracts subject participants, and those who assist in the formation of such contracts, to civil penalties or felony conviction (see Domestic Relations Law § 123; Social Services Law §§ 374[6]; 389), the only sanction against unpaid surrogacy contracts is to treat them as void and unenforceable (see Domestic Relations Law § 122; Matter of Giavonna F.P.-G. [Frank G.—Renee P.-F.], 142 AD3d 931, 933; Itskov v New York Fertility Inst., Inc., 11 Misc 3d 68, 69 [App Term, 2d Dept]).
The Legislature, though it declared surrogate parenting contracts to be against public policy, recognized the prospect that, notwithstanding its declaration, parties might proceed to enter into such contracts and that children would be born as the result of such contracts. The Legislature provided for this prospect. Domestic Relations Law § 124 states that, in any action or proceeding "involving a dispute between the birth mother" and one or more genetic parents or grandparents "regarding parental rights, status or obligations with respect to a child born pursuant to a surrogate parenting contract . . . the court shall not consider the birth mother's participation in a surrogate parenting contract as adverse to her parental rights, status, or obligations" (Domestic Relations Law § 124[1]). This statute "simply provides that the gestational carrier's participation in a surrogate parenting contract should not be held against her" where there is a dispute regarding parentage (T.V. v New York State Dept. of Health, 88 AD3d 290, 301). Where, as here, there is no dispute because the genetic and gestational parents are in agreement with respect to the legal parentage of the child, the protection of the gestational mother contemplated in Domestic Relations Law §§ 122 and 124 is not implicated (see T.V. v New York State Dept. of Health, 88 AD3d at 301).
The Legislature also made provision for the gestational surrogate to validly terminate her parental rights to a child born of a surrogate parenting contract. The statute expressly provides that a gestational surrogate may execute "a valid surrender or consent to the adoption" (Domestic Relations Law § 124[2]). Thus, it is plain that the fact that a child was born as the result of an unenforceable surrogacy agreement does not foreclose an adoption of the resulting child, upon the surrogate's consent (see Matter of J.J., 44 Misc 3d 297, 304 [Fam Ct, Queens County] [holding that a paid surrogacy contract did not foreclose an adoption]).
The Family Court should not have viewed the adoption petition presented by the appellant as requiring the court to validate or enforce a surrogate parenting contract. The appellant was not, and is not, seeking to have the surrogate parenting contract specifically enforced or otherwise seeking a remedy for a purported breach of the contract. The contract had, in fact, been performed and a child conceived and born on account of it. The court was asked only to approve an adoption which had been agreed to, by use of a statutorily-prescribed mechanism and form, by the gestational mother, exercising her right to do so as expressly recognized by governing statute. Thus, the petition before the court only sought to invoke the court's power and its responsibility to provide for a child subject to its jurisdiction. The court's exercise of its judicial authority did not, and does not, involve any judicial sanction for the underlying circumstances by which the child was conceived and born.
The Adoption of the Child by His Biological Father is Permitted by the Adoption Statute
The second reason given by the Family Court for dismissing the adoption petition here was that, under New York's adoption statute, a biological parent may not adopt his or her own child. This determination was also erroneous.
"Adoption is the legal proceeding whereby a person takes another person into the relation of child and thereby acquires the rights and incurs the responsibilities of parent in respect of such other person" (Domestic Relations Law § 110). Our adoption statute specifies the categories of persons who may adopt a child. It states that "[a]n adult unmarried person, an adult married couple together, . . . any two unmarried adult intimate partners together," or a formally separated person may adopt another person (id.). Further, a married couple together may adopt a child of either of them, and a spouse may adopt a child of the other spouse (id.). If satisfied that the best interests of the child will be promoted by the adoption of the child by an authorized person or persons, the judge or surrogate "shall make an order approving the adoption" (Domestic Relations Law § 114[1]).
Since adoption is solely the creation of statute (see Matter of Eaton, 305 NY 162, 165), the adoption statute must be strictly construed (see Matter of Jacob, 86 NY2d 651, 657). "What is to be construed strictly and applied rigorously in this sensitive area of the law, however, [*3]is legislative purpose as well as legislative language. Thus, the adoption statute must be applied in harmony with the humanitarian principle that adoption is a means of securing the best possible home for a child" (id. at 657-658). "[I]n strictly construing the adoption statute, our primary loyalty must be to the statute's legislative purpose—the child's best interest" (id. at 658).
The appellant here, as an "adult unmarried person," is among those who are statutorily authorized to adopt a child. That he fits within the statutory definition is not, however, conclusive, as our loyalty must be to the statute's legislative purpose. Thus, in Matter of Robert Paul P. (63 NY2d 233, 238), a man was not permitted to adopt his same-sex partner, even though the statutory language permitted the adoption, since the purpose of the statute is to create a parent/child relationship. Conversely, prior to the statute being expressly amended to permit joint adoption by unmarried intimate partners, the Court of Appeals allowed second-parent adoptions by partners of biological parents (see Matter of Jacob, 86 NY2d 651).
Here, the appellant, an otherwise qualified "adult unmarried person," seeks to adopt a child in order to gain legal and social recognition for the parent/child relationship already existing between himself and the child. The Family Court disallowed it on the ground that there is no authority for a parent to adopt his or her biological child. We disagree. The blanket prohibition, invoked by the Family Court, against legal adoption of a child by a biological parent, is not supported by either the language of the statute or its purpose.
There is nothing in the text of the Domestic Relations Law which precludes a parent from adopting his or her own biological child. While adoption, as we recognized above, is a statutory creation, the adoption sought here is authorized by the governing statute and there is nothing in the statute which precludes it. Further, to the extent that the Legislature has contemplated this subject, it has permitted adoptions notwithstanding an existing biological connection.
Domestic Relations Law § 110 expressly provides that "[a]n adult or minor married couple together may adopt a child of either of them born in or out of wedlock." Thus, the statute expressly provides that a married person may adopt his or her own child together with his or her spouse, and does not limit the couple to a second-parent adoption. This provision allows the spouse who is the biological parent to jointly adopt his or her own child together with his or her spouse, notwithstanding the preexisting biological connection. Thus, it is readily apparent that the statute does not totally prohibit adoptions of biological children by their parents.
Apart from the absence of an express legislative prohibition on the adoption of biological children by their parents, we perceive nothing in the purposes of the statute that should lead us to engraft such a prohibition by judicial construction. Rather, such adoptions may serve salutory purposes which are consistent with the overarching legislative purpose of promoting the best interests of adoptive children.
The issue we consider here is relatively novel and there is little by way of precedent. Apart from the fact that the appellant successfully adopted his biological twin children in 2013, there is one reported case in which a petition for adoption of a biological child was granted. In Matter of Sebastian (25 Misc 3d 567 [Sur Ct, NY County]), the genetic mother and the gestational mother had been married in the Netherlands. While a legal relationship already existed in New York due to the presumption of legitimacy, other states, at the time, refused to recognize the validity of the marriage or the genetic mother's parentage. Further, although the Surrogate's Court believed that the genetic mother should be able to obtain an order of filiation, because of the nature of the Surrogate's Court it was unclear whether the Surrogate's Court had jurisdiction to do so outside of an adoption proceeding. Thus, adoption provided the only means of ensuring that the genetic mother's parental relationship would be recognized throughout the United States.
While Matter of Sebastian presented unique issues related to the Full Faith and Credit Clause of the United States Constitution (US Const, art IV, § 1), there may be other situations in which the adoption of one's biological child is the only means to establish a parent/child relationship in this state. For example, if a married woman gives birth to a child biologically fathered by a man other than her husband, the husband is presumed to be the father of the child (see Matter of Findlay, 253 NY 1, 7), and the biological father may be estopped from asserting his paternity (see Family Ct Act §§ 418[a]; 532[a]; Matter of Shondel J. v Mark D., 7 NY3d 320, 327). The legal parents of the child would be the married couple. If, many years later, the husband died or divorced the mother, and the mother then married the biological father, the biological father would have no mechanism for creating a legal parent/child relationship with the child other than a second-parent adoption. Similarly, if both the husband and wife died, and the biological father wanted to establish a legal [*4]parental relationship, adoption of his biological child would be the only mechanism for creating a parent/child relationship.
Here, in dismissing the adoption petition, the Family Court relied on Matter of Zoe D.K. (26 AD3d 22), which held that an unwed biological mother could not adopt her own child so as to remove the biological father from the birth certificate. As the Appellate Division, Fourth Department, viewed it, the adoption did not provide " a means of securing the best possible home'" for the child (id. at 24, quoting Matter of Jacob, 86 NY2d at 658), nor did it give " legal recognition to an existing family unit'" (Matter of Zoe D.K., 26 AD3d at 24, quoting Matter of Raquel Marie X., 76 NY2d 387, 398). Rather, as a result of the adoption, the father, without his knowledge or consent, was relieved of all parental responsibilities and rights, while the rights and responsibilities of the mother remained unchanged. As the adoption did not serve the purpose of the statute, the court granted the father's application to vacate the order of adoption (see Matter of Zoe D.K., 26 AD3d at 24-25).
The situation here is significantly different. While the appellant seeks to have the surrogate removed as a parent, an adoption would not be adverse to her rights, but rather is undertaken with her consent. Further, the surrogate has no genetic connection to the child and was never intended to be a parent to the child. Although a surrogacy contract is not enforceable against the birth mother to deprive her of parental rights, it may be used as "evidence of the parties' unequivocal intention" that the intended parents become the parents of the child (Matter of Frank G. v Renee P.-F., 142 AD3d 928, 930).
The appellant, at present, has no legal relationship with the child, and the record before us indicates that the surrogate neither has, nor ever sought to have, any relationship of any sort with the child. Thus, an adoption of this child by the appellant would "create[ ] a legal parent-child relationship where none previously existed" (Matter of Sebastian, 25 Misc 3d at 571; see Domestic Relations Law § 110), while severing a legal relationship with the gestational mother that exists solely as a legal abstraction with no physical or emotional manifestation. While the appellant could obtain an order of filiation, such would leave the surrogate as the legal mother, which was not their intent in creating the child. Further, the continuance of a bare legal tie between the child and the surrogate would not require her to actually assume a maternal role toward the child. The surrogate would be left as a vestigial parent only. While her rights could be terminated for abandonment or neglect, absent an adoption, only governmental authorities could initiate termination proceedings, leaving both the appellant and the child at the mercy of governmental discretion.
Relegating the appellant, and others similarly situated, to seeking orders of filiation would be a shallow remedy. Originally created in order to avoid having children born out-of-wedlock becoming public charges, paternity proceedings have historically had as their principal purpose ensuring that the subject children are provided with adequate financial support (see Matter of Cathleen P. v Gary P., 63 NY2d 805, 807; Matter of L. Pamela P. v Frank S., 59 NY2d 1, 5). While statutes have expanded the impact of orders of filiation beyond financial support to such matters as inheritance (see EPTL 4-1.2[a][2][A]), workers' compensation benefits, and notice of adoption (see Matter of Cathleen P. v Gary P., 63 NY2d at 807; Matter of Kordek v Wood, 90 AD2d 209, 212), orders of filiation are not the legal equivalent of adoptions, which grant full and complete legal recognition to an existing familial relationship between parent and child (see Matter of Raquel Marie X., 76 NY2d at 398). Nor would an order of filiation provide the appellant with judicial authorization to make decisions on behalf of the child. For that, the appellant would have to first obtain an order of filiation and then initiate a custody proceeding, thus requiring him to initiate successive and time-consuming proceedings in which the ostensibly adverse party would be the gestational surrogate who had already renounced her own tie to the child.
An apt analogy are cases involving a declaration of maternity of a genetic mother over a gestational mother. In such cases, courts have presumed that the genetic mother could have adopted her biological child. This Court, in T.V. v New York State Dept. of Health (88 AD3d at 301), observed that there was no provision prohibiting a declaration of maternity and the Domestic Relations Law "does not limit the parties to a formal adoption proceeding." Likewise, in Matter of Andres A. v Judith N. (156 Misc 2d 65, 71 [Fam Ct, Queens County]), the Family Court held that it did not have jurisdiction to enter an order of maternity, but noted that the biological mother was [*5]not without a remedy since she could adopt her biological children [FN2] (see also Feigenbaum v New York State Dept. of Health, 2010 WL 9596711, 2010 NY Misc LEXIS 6860 [Sup Ct, Suffolk County, No. 2009-019430]). The court in Doe v New York City Bd. of Health (5 Misc 3d 424, 427 [Sup Ct, NY County]) noted that Domestic Relations Law § 124 "specifically leaves open the type of legal proceeding that may be instituted following the birth of a child born pursuant to a surrogate parenting contract, and does not limit the parties to a formal adoption proceeding."
Since the adoption statute permits adoption by an unmarried adult, an adoption which results in the child having only one legal parent is not against the language or purpose of the adoption statute. Moreover, the continuity of a fictitious family structure whereby a gestational surrogate with no genetic ties or intention to be a parent remains a legal parent is hardly consonant with a child's best interests. Thus, under the circumstances presented, the adoption of one's biological child from a gestational surrogate complies with the purpose of the adoption statute and should be permitted where, as in all adoption cases generally, the proposed adoption in the best interests of the child [FN3]. Our conclusion is consistent with legislation recently passed by both the State Senate and the State Assembly, and awaiting action by the Governor, which would amend Domestic Relations Law § 110 to explicitly provide that where an adoption petitioner's parentage is legally recognized under New York law, adoption should not be denied solely on the basis that such parentage is already legally recognized (see NY Senate Actions on 2019-2020 Senate Bill S3999; NY Assembly Actions on 2019-2020 Assembly Bill A460).
Conclusion
For the reasons stated, the order of dismissal is reversed, on the law, the petition is reinstated, and the matter is remitted to the Family Court, Queens County, for further proceedings on the petition, to be conducted forthwith before a different Judge.
LASALLE, BARROS and IANNACCI, JJ., concur.
ORDERED that the order of dismissal is reversed, on the law, without costs or disbursements, the petition is reinstated, and the matter is remitted to the Family Court, Queens County, for further proceedings on the petition, to be conducted forthwith before a different Judge.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: We note that the State Senate recently passed legislation that would change New York's public policy in this regard; however, the legislation was not passed by the State Assembly (see NY Senate Actions on 2019-2020 Senate Bill S2071-B; see also NY Assembly Actions on 2019-2020 Assembly Bill A1071-C).

Footnote 2: The biological mother opted instead to obtain a declaration of maternity from the Supreme Court (see Arredondo v Nodelman, 163 Misc 2d 757 [Sup Ct, Queens County]).

Footnote 3: In view of this conclusion, we need not reach the appellant's alternative argument, which was not raised below, that denial of the adoption would deny him equal protection of the laws. Nor do we consider the appellant's argument that denial of the adoption discriminated against him on the basis of his marital status.