[933 NE2d 705, 907 NYS2d 106]

The People of the State of New York, Appellant, v Edgar Correa, Respondent.

The People of the State of New York, Respondent, v Joao Fernandez, Appellant.

The People of the State of New York, Appellant, v Allen Mack, Respondent.

Argued May 5, 2010; decided June 3, 2010

**POINTS OF COUNSEL**

*Robert T. Johnson, District Attorney,* Bronx (*Joseph N. Ferdenzi* and *Frances Y. Wang* of counsel), for appellants in the first and third above-entitled actions. The Appellate Division erroneously decided that the Chief Judge and Chief Administrative Judge were without authority to order the transfer of defendant's case from Criminal Court to Supreme Court. (*People v Cepeda,* 71 AD3d 422; *People v Jones,* 18 Misc 3d 63, 10 NY3d 767; *People v Darling,* 50 AD2d 1038; *Kagen v Kagen,* 21 NY2d 532; *Thrasher v United States Liab. Ins. Co.,* 19 NY2d 159; *People v Turza,* 193 Misc 2d 432; *Matter of Malloy,* 278 NY 429; *Motor Veh. Mfrs. Assn. of U.S. v State of New York,* 75 NY2d

175; *People v Luciano*, 10 NY3d 499; *People v Wrotten*, 14 NY3d 33.)

*Legal Aid Society, Criminal Appeals Bureau*, New York City (*Martin M. Lucente* and *Steven Banks* of counsel), for appellant in the second above-entitled action. Appellant's convictions must be reversed because: (1) the Supreme Court lacked jurisdiction to try and sentence him under a misdemeanor information, where CPL 210.05 provides that the Supreme Court may only acquire trial jurisdiction over criminal proceedings initiated by indictment or superior court information; and (2) the transfer of this case from Criminal Court to Supreme Court was not authorized by any other provisions of the New York Constitution or statutes. (*People v Harper*, 37 NY2d 96; *People v Wiltshire*, 23 AD3d 86; *People v Correa*, 70 AD3d 532; *People v Jones*, 18 Misc 3d 63; *Thrasher v United States Liab. Ins. Co.*, 19 NY2d 159; *Matter of Morgenthau v Roberts*, 65 NY2d 749; *Rodriguez v Myerson*, 69 AD2d 162; *Sohn v Calderon*, 78 NY2d 755; *Matter of Dalliessi v Marbach*, 56 AD2d 858; *Pulerwitz v Rand*, 141 AD2d 623.)

*Legal Aid Society, Criminal Appeals Bureau*, New York City (*Harold V. Ferguson, Jr.,* and *Steven Banks* of counsel), for respondents in the first and third above-entitled actions. The Appellate Division, First Department correctly determined that the Chief Judge of the Court of Appeals and the Chief Administrative Judge lacked the authority to create the Bronx Criminal Division of the Supreme Court. (*People v Harper*, 37 NY2d 96; *People v Wiltshire*, 23 AD3d 86; *People v Jones*, 18 Misc 3d 63; *Thrasher v United States Liab. Ins. Co.*, 19 NY2d 159; *Matter of Morgenthau v Roberts*, 65 NY2d 749; *Rodriguez v Myerson*, 69 AD2d 162; *Sohn v Calderon*, 78 NY2d 755; *Matter of Dalliessi v Marbach*, 56 AD2d 858; *Pulerwitz v Rand*, 141 AD2d 623; *Jiggetts v Grinker*, 75 NY2d 411.)

*Charles J. Hynes, District Attorney*, Brooklyn (*Jodi L. Mandel* and *Leonard Joblove* of counsel), for respondent in the second above-entitled action. The transfer of defendant's unindicted misdemeanor case from Criminal Court to the Supreme Court Integrated Domestic Violence Part comported with the State Constitution and state statutes. Moreover, the Supreme Court Integrated Domestic Violence Part properly exercised jurisdiction over defendant's case. (*People v Patterson*, 39 NY2d 288, 432 US 197; *Matter of Met Council v Crosson*, 84 NY2d 328; *Corkum v Bartlett*, 46 NY2d 424; *Matter of New York State Assn.*

of Criminal Defense Lawyers v Kaye, 96 NY2d 512; People v Urbaez, 10 NY3d 773; Levenson v Lippman, 4 NY3d 280; Matter of Dalliessi v Marbach, 56 AD2d 858; Pulerwitz v Rand, 141 AD2d 623; Matter of Fry v Village of Tarrytown, 89 NY2d 714; Kagen v Kagen, 21 NY2d 532.)

Michael Colodner, New York City, Marc Bloustein and Paul McDonnell for Chief Administrative Judge and another, amici curiae in the first above-entitled action. The Bronx Criminal Division, sitting as a Supreme Court, has jurisdiction to hear unindicted misdemeanors transferred to the Division from the New York City Criminal Court. (Matter of Morgenthau v Cooke, 56 NY2d 24; Matter of Marro v Bartlett, 46 NY2d 674; People v Fernandez, 72 AD3d 303; Matter of Met Council v Crosson, 84 NY2d 328; People v Robinson, 6 Misc 3d 645; People v Gonzalez, 6 Misc 3d 1034[A], 2005 NY Slip Op 50291[U]; Levenson v Lippman, 4 NY3d 280; People v Hickey, 40 NY2d 761; Matter of Molea v Marasco, 64 NY2d 718; Matter of Michelson v Clyne, 84 AD2d 883.)

### OPINION OF THE COURT

GRAFFEO, J.

Defendants in these three cases challenge the rules promulgated by the Chief Judge and Chief Administrative Judge that created either the Bronx Criminal Division or Integrated Domestic Violence Part in Supreme Court, which resulted in the transfer of their misdemeanor prosecutions from local criminal courts to Supreme Court for trial. Although they did not object to the transfer procedure in the trial court, they argued on appeal that Supreme Court lacked subject matter jurisdiction over their trials and that the rules violate the New York Constitution and the Criminal Procedure Law. Rejecting defendants' arguments, we hold that the administrators of the Unified Court System were empowered under our State Constitution and the Judiciary Law to adopt these rules and that Supreme Court—a court of general, concurrent jurisdiction—had the power to adjudicate these misdemeanor cases.

### Integrated Domestic Violence Parts

In January 2004, after consultation with the Administrative Board and with the consent of the Court of Appeals, the Chief Judge of the State of New York promulgated part 41 of the Rules of the Chief Judge providing for the establishment of Integrated Domestic Violence (IDV) Parts in Supreme Court. The rule directed that the specialized part

"be devoted to the hearing and determination, in a single forum, of cases that are simultaneously pending in the courts if one of them is a domestic violence case in a criminal court and the other is a case in Supreme or Family Court that involves a party or witness in the domestic violence case; or if one is a case in criminal court, Family Court or Supreme Court and the other is a case in any other of these courts having a common party or in which a disposition may affect the interests of a party in the first case" (22 NYCRR 41.1 [a] [1]).

The intent of the IDV directive was to allow matters involving a single family to be resolved in one court by the same jurist, thereby eliminating fragmented judicial adjudication and relieving the parties of the burden and costs of having multiple actions pending in different courts. In addition to streamlining the litigation process for litigants and providing better access to community services for families, the new IDV Parts also increased judicial efficiency by avoiding duplication of effort by multiple courts, reducing scheduling conflicts and avoiding inconsistent outcomes.

Soon after the Chief Judge issued part 41, the Chief Administrative Judge implemented the new rule by adopting part 141 of the Rules of the Chief Administrator of the Courts, which defined those "IDV-eligible cases" subject to transfer to Supreme Court. Under part 141, cases that meet the criteria are sent to an IDV Part where, within five days, the cases are screened to determine whether transfer will promote the administration of justice. If so, a formal transfer order is issued and the case is retained by the IDV Part for disposition. If not, the case is returned to the originating court. There are currently 44 Supreme Court IDV Parts in New York State.

## People v Fernandez

In January 2007, defendant Joao Fernandez was charged by misdemeanor information filed in New York City Criminal Court, Kings County, with multiple counts of aggravated harassment in the second degree after he contacted his former paramour by telephone 62 times in one evening and repeatedly threatened her with physical harm. Fernandez and the complainant had been involved in multiple prior Family Court cases regarding disputes about their two children. After his arraignment in New York City Criminal Court, the case was transferred

to the IDV Part in Kings County Supreme Court where a non-jury trial was conducted. Fernandez was convicted of three counts of attempted aggravated harassment in the second degree and sentenced to concurrent terms of one year's probation. He was also directed to participate in a variety of domestic violence accountability and other programs.

Although Fernandez raised no objection in the trial court to the transfer of his case, in his appeal to the Appellate Division, Second Department, he argued that the IDV Part—an arm of Supreme Court—lacked the authority to exercise subject matter jurisdiction over his misdemeanor case because it was prosecuted by information rather than an indictment or superior court information issued after waiver of indictment. Defendant also contended that the Chief Judge and Chief Administrative Judge exceeded the scope of their authority when they issued the IDV directives.[1] In addition, he sought reversal based on an asserted evidentiary error. The Second Department unanimously rejected defendant's arguments and affirmed his conviction (*People v Fernandez*, 72 AD3d 303 [2010]). A Justice of that court granted defendant leave to appeal (14 NY3d 807 [2010]).

### The Bronx Criminal Division

About nine months after the IDV directives were issued, in consultation with the Administrative Board and with the consent of the Court of Appeals, the Chief Judge promulgated part 42 of the Rules of the Chief Judge establishing a criminal division in the Supreme Court in Bronx County. The new part— denominated the Bronx Criminal Division (BCD)—was vested with the authority to adjudicate cases commenced in the New York City Criminal Court, Bronx County, when at least one felony or misdemeanor offense was charged. The intent was to permit cases originating in the Criminal Court to be reassigned to the BCD for trial in order to alleviate a trial backlog that had developed in the Criminal Court. The Chief Administrative Judge adopted part 142 directing, with specified limitations, that certain felony and misdemeanor cases pending in Criminal Court of the City of New York in Bronx County be transferred to the BCD part of Supreme Court following arraignment, if the cases were not resolved at arraignment. By order of the Administrative Judge of Bronx County, the BCD directives were implemented on November 5, 2004.

---

1. Fernandez has never claimed that his case did not meet the IDV eligibility criteria set forth in the rules.

*People v Correa; People v Mack*

In October 2005, defendant Edgar Correa was charged in a misdemeanor information filed in New York City Criminal Court, Bronx County, with various class A misdemeanors and harassment in the second degree, a violation, resulting from an altercation with his wife. After arraignment, his case was transferred to the BCD and a nonjury trial was conducted. Correa was acquitted of the misdemeanor offenses but convicted of the harassment charge and sentenced to 15 days in jail.

Defendant Allen Mack was charged in an information with the misdemeanor offenses of obstructing governmental administration and assault in the third degree, as well as one count of harassment in the second degree, a violation, as a result of disruptive behavior during a parole hearing. Following his arraignment in New York City Criminal Court, Bronx County, Mack's case was transferred to the BCD for a nonjury trial in August 2006. He was convicted of attempted assault in the third degree and harassment for which he received 90-day and 15-day jail sentences, respectively.

Both Correa and Mack appealed and, in their initial briefs, neither defendant protested that his trial had been conducted in the BCD part of Supreme Court. However, in February 2009, the Appellate Division, First Department, sua sponte requested that the attorneys in each case brief two additional issues:

> "(1) Whether the establishment of the Criminal Division of Supreme Court in Bronx County under Part 142 of the Rules of the Chief Administrator is consistent with the Constitution and statutes of the State of New York?

> "(2) Whether the Supreme Court possessed jurisdiction over a criminal case absent the filing of an indictment or superior court information?"

In response to the inquiry, defense counsel filed supplemental briefs asserting that Unified Court System (UCS) administrators exceeded the authority granted them under the Constitution and relevant statutes when they issued the BCD directives and that Supreme Court lacked subject matter jurisdiction to try misdemeanor offenses prosecuted on an information. Relying on CPL 210.05, defendants contended that Supreme Court has the power to adjudicate misdemeanor offenses only when the grand jury has included them in an indictment or a defendant has waived indictment and agreed to be prosecuted by a

superior court information (SCI). The People countered that various provisions of the Constitution and the Judiciary Law expressly allowed UCS administrators to issue the rules relating to transfer of misdemeanor cases to the BCD part and, as an arm of Supreme Court, the BCD possessed the requisite jurisdiction to try defendants' "unindicted" misdemeanor cases.

In February 2010, in a divided opinion, the First Department reversed the conviction in *Correa* and dismissed the accusatory instrument, crediting defendant's jurisdictional arguments (*People v Correa*, 70 AD3d 532 [2010]). In his dissent, Justice Acosta disagreed with the majority, finding ample constitutional and statutory basis for the issuance of the BCD directives and concluding that, as a court of general, concurrent jurisdiction, Supreme Court is empowered to adjudicate misdemeanor cases, regardless of whether the charge is contained in an information, an indictment or an SCI. In a separate decision, the First Department reversed Mack's conviction and dismissed the misdemeanor information, citing the decision in *Correa* (*People v Mack*, 70 AD3d 555 [2010]). In each case, Justice Acosta granted the People leave to appeal.

<u>Preservation</u>

■ Although none of the defendants in these cases timely objected either in New York City Criminal Court or Supreme Court to the transfer of their misdemeanor cases, we may consider their arguments in this Court because each defendant contends that Supreme Court lacked subject matter jurisdiction to try his case. If Supreme Court—acting through the IDV Part or the BCD—did not possess the authority to conduct these proceedings, this would be a fundamental, nonwaivable defect in the mode of proceedings that could be raised by defendants on their direct appeal despite their failure to comply with preservation requirements (*see People v Casey*, 95 NY2d 354, 365 [2000]; *see e.g. People v Nicometi*, 12 NY2d 428 [1963] [where defendant argued that a Court of Special Sessions lacked the subject matter jurisdiction to try the offense with which he was charged, claim could be raised on appeal notwithstanding defendant's failure to object in the trial court]). Accordingly, we must address defendants' jurisdictional arguments on the merits.

<u>The Authority to Issue the IDV and BCD Directives</u>

■ We begin by considering the claim that the UCS administrators exceeded the power granted them in the New York

Constitution and relevant statutes when they issued the directives creating the BCD and the IDV Part. In *Correa* and *Mack*, the First Department majority concluded that the rules adopted by the Chief Judge and Chief Administrative Judge amounted to ultra vires acts because the transfer of cases to Supreme Court is a matter of "practice and procedure" that falls within the exclusive province of the Legislature. We disagree.

Article VI of the New York Constitution—the Judiciary Article—created a "unified court system for the state" (NY Const, art VI, § 1 [a]) and vested the Chief Judge with the authority to administer the system, with the assistance of the Administrative Board (composed of the Chief Judge and the Presiding Justices of each Appellate Division) (art VI, § 28). Together, they are empowered to appoint a chief administrator to "supervise the administration and operation of the unified court system" and exercise powers delegated by the Chief Judge (art VI, § 28 [a], [b]). The Chief Judge may "establish standards and administrative policies for general application throughout the state," which shall be submitted to the Court of Appeals, together with the recommendations of the Administrative Board, and approved by the Court (art VI, § 28 [c]).

We have previously held that the constitutional requirement that the Chief Judge and Chief Administrative Judge consult with the Administrative Board and receive approval from the Court of Appeals before implementing broad-based administrative policies ensures critical "multistage, multiperson review" and is therefore an indispensable component of the constitutional scheme (*see Matter of Morgenthau v Cooke*, 56 NY2d 24, 32 [1982]). When administrative authority is exercised in conformity with the consultation and approval requirements, UCS administrators possess broad express and implied powers to take whatever actions are necessary for the proper discharge of their responsibilities (*see Matter of New York State Assn. of Criminal Defense Lawyers v Kaye*, 96 NY2d 512 [2001]).

The Judiciary Article also specifically addresses the reassignment of cases to and from Supreme Court. Article VI, § 19 (a) states:

"As may be provided by law, the supreme court may transfer to itself any action or proceeding originated or pending in another court within the judicial department other than the court of claims upon a finding that such a transfer will promote the administration of justice."

The authority of UCS administrators to transfer cases to and from Supreme Court is also recognized in statute. Judiciary Law § 211 (1) (a) explicitly authorizes the Chief Judge, in consultation with the Administrative Board and with the consent of the Court of Appeals, to "establish standards and administrative policies for general application to the unified court system throughout the state, including but not limited to standards and administrative policies relating to . . . transfer of judges and causes among the courts." Thus, the Legislature included the transfer of cases as one of the administrative actions that could be taken by the Chief Judge and Chief Administrative Judge. Based on Supreme Court's transfer powers under article VI, § 19 (a) and the broad administrative authority vested pursuant to article VI, § 28 and Judiciary Law § 211, we conclude that UCS administrators were authorized to promulgate the IDV and BCD directives. Before the directives were issued, the Administrative Board was consulted and consent was obtained from the Court of Appeals. And although the First Department majority suggested that the BCD directives merged the Supreme Court and the New York City Criminal Court, eviscerating the latter, in reality the BCD and IDV directives accomplished only two things: they created new "parts" in Supreme Court and they provided that certain cases be transferred to those parts. Both actions were permissible under the relevant constitutional and statutory provisions.

No one has disputed the Chief Administrative Judge's power to create new parts within existing courts—a prerogative that appears in Judiciary Law § 212 (1) (c). As for the exercise of transfer authority, there has long been a question concerning whether the drafters of article VI, § 19 (a) intended to require statutory authorization before Supreme Court may transfer to itself cases arising in other courts (*see e.g. Matter of Dalliessi v Marbach*, 56 AD2d 858 [2d Dept 1977] [concluding that section 19 (a) is not "self-executing" and that statutory authority is required]). But even assuming legislative action was necessary, the statutory predicate for the rules at issue appears in Judiciary Law § 211 (1) (a), which permits the Chief Judge to transfer cases between courts to further the efficient administration of justice. The provision contains no language preventing the transfer of misdemeanor cases to Supreme Court.

In determining that the Chief Judge and Chief Administrative Judge exceeded their constitutional and statutory powers when adopting the BCD directives, the First Department majority stated that they "caus[ed] a collapse of the

constitutionally created Criminal Court of the City of New York in the Bronx" and "impinged on the Legislature's reserved primary power to alter and regulate jurisdiction, practice and procedure under State Constitution, article VI, § 30" (*Correa*, 70 AD3d 532, 534 [2010]). Contending that the Legislature has reserved to itself the power to regulate practice and procedure, the First Department reasoned that the ability of UCS administrators to direct that certain cases be heard in Supreme Court invaded that legislative domain. Again, we disagree.

The Legislature certainly exercises significant control over the regulation of practice and procedure in the courts. But article VI, § 30 does not address or purport to curtail the transfer authority granted in article VI, § 19 (a) or the administrative power vested in UCS administrators in article VI, § 28. And in drafting Judiciary Law § 211, the Legislature made clear that it does not view the transfer of cases to be strictly a matter of practice and procedure—a conclusion that is especially appropriate given that UCS administrators may decide to reassign cases to alleviate court congestion (the impetus for the BCD directives). Section 211—entitled "[a]dministrative functions of the chief judge of the court of appeals"— includes an express reference to the transfer of cases between courts in the category of "standards and administrative policies" that the Chief Judge is directed to establish. The statute does not characterize transfer as a practice and procedure issue, much less indicate that policies relating to reassignment of cases fall within the sole province of the Legislature. As indicated in *Corkum v Bartlett* (46 NY2d 424 [1979]), the Legislature's decision to classify certain matters as administrative in the statutory delineation of the powers of UCS administrators is compelling evidence that it intended to recognize their authority over such matters.

Given the historical context in which these provisions were adopted, it is not surprising that the drafters of the Judiciary Article expressly permitted the transfer of cases to and from Supreme Court and that, in Judiciary Law § 211, the Legislature vested UCS administrators with the authority to establish and implement transfer policies. The creation of the Unified Court System in 1962 was prompted in part by the uneven distribution of cases throughout the existing courts, resulting in some courts being "overburdened, congested and delayed" while others did not have enough work to engage the staff full-time (*see* Report of State of New York Temporary Commission on the

Courts [1955]). A statewide system of court administration was deemed necessary in order to efficiently marshal judicial resources and redirect cases to avoid the imbalances in workload and excessive delays that had plagued the prior system (*id.*). The constitutional and statutory transfer provisions fulfill this requirement, thereby facilitating the efficient administration of justice.

Although the First Department was concerned that the BCD directives rendered the New York City Criminal Court, Bronx County, a "shell of its former self" (70 AD3d at 538), it appears that the court continues to have a heavy caseload and performs important functions in the criminal court system. That court still conducts arraignments and other preliminary proceedings on all informations, including those that charge misdemeanors and felonies—a transfer occurs only if a case is not disposed of at arraignment. In 2008, 76,631 arraignments were conducted in that venue and 48.9% of those cases were resolved by plea during those proceedings. Thus, the directives did not affect roughly 50% of the court's caseload. Of the cases that survived arraignment, only some met the transfer criteria and a significant number of those—any case involving a felony—would have been divested to Supreme Court for trial anyway, even absent the BCD directives, since local criminal courts lack trial jurisdiction over felony charges (*see* CPL 10.30).

Although the creation of the BCD certainly impacted the work of the New York City Criminal Court, we are unpersuaded that its role has been restricted to the point that it has ceased to effectively fulfill the role assigned under the New York Constitution (*see* NY Const, art VI, § 15). Nor, in any event, did UCS administrators exceed their authority and impermissibly tread in the legislative domain when they issued the BCD or IDV directives. Accordingly, we decline to set aside the rules on that basis.

## Supreme Court Jurisdiction

■ Defendants further contend that, even if UCS administrators had the power under the constitutional and statutory scheme to reassign cases (as we have concluded), that authority was exceeded when the BCD and IDV directives were adopted because cases may only be transferred to a court that possesses subject matter jurisdiction. Primarily relying on CPL 210.05, defendants claim that Supreme Court's power to try a misdemeanor is restricted to cases in which the charge is included in

an indictment or SCI (issued upon waiver of indictment), meaning that the court lacks subject matter jurisdiction over misdemeanors charged in an information—so-called "unindicted" misdemeanors. Since none of the defendants in these cases was indicted or waived indictment and agreed to be prosecuted by SCI, they argue that their trials in Supreme Court were a nullity. This argument lacks merit.

There is no question that the Criminal Procedure Law generally contemplates that violations and misdemeanors will be tried in local criminal courts and that felonies, which may be initiated by the filing of an information or complaint but must ultimately be prosecuted by indictment or SCI, will be tried in the superior courts—County Court or Supreme Court. But the issue presented in this case is not whether misdemeanor cases are typically tried in local criminal courts or even whether, when adjudicated in Supreme Court, they are usually charged in an indictment—the answer to both of these questions is undoubtedly "yes." This dispute concerns the extent to which Supreme Court can exercise subject matter jurisdiction over misdemeanor trials.

To determine the scope of Supreme Court's jurisdiction, we first look to the New York Constitution, which provides: "The supreme court shall have general original jurisdiction in law and equity and the appellate jurisdiction herein provided" (NY Const, art VI, § 7 [a]). Under this provision, Supreme Court "is competent to entertain all causes of action[ ] unless its jurisdiction has been specifically proscribed" (*Thrasher v United States Liab. Ins. Co.*, 19 NY2d 159, 166 [1967] [statutory requirement that judgment be served on insured was a substantive element of claim and not a limitation on Supreme Court's subject matter jurisdiction]). We have recognized that, when the drafters of article VI created the UCS in 1962 and continued Supreme Court as a court of general jurisdiction, if anything its jurisdiction was enlarged to encompass claims that it might not have heard under the previous constitutional scheme (*see Kagen v Kagen*, 21 NY2d 532 [1968] [Supreme Court shares concurrent jurisdiction with Family Court over child support disputes, although it could not have heard such cases prior to 1962]).

To be sure, the jurisdiction of Supreme Court is limited elsewhere in the New York Constitution. For example, in preserving the State's historical sovereign immunity from suit, Supreme Court cannot exercise jurisdiction over claims for money damages brought against the State, which must be

initiated and tried in the Court of Claims (*see Pollicina v Misericordia Hosp. Med. Ctr.*, 82 NY2d 332, 338 n 3 [1993]; *Kagen*, 21 NY2d at 538; *see generally* NY Const, art VI, § 9). Similarly, under the Supremacy Clause of the United States Constitution, Supreme Court may not hear cases in which exclusive jurisdiction has been conferred on the federal courts (*Pollicina*, 82 NY2d at 338 n 3; *see e.g. Financial Indus. Regulatory Auth., Inc. v Fiero*, 10 NY3d 12 [2008] [state courts lacked jurisdiction to hear action for enforcement of disciplinary penalties arising under the Securities Exchange Act]). And Supreme Court is subject to the same substantive limitations imposed on other courts.[2] Like every other court in New York State, Supreme Court may not convict a defendant of a felony absent compliance with the indictment and waiver of indictment provisions in article I, § 6 of the New York Constitution (*see e.g. People v Wiltshire*, 23 AD3d 86 [1st Dept 2005], *lv denied* 6 NY3d 840 [2006]).[3]

But, subject to the limitations discussed above, the New York Constitution vests Supreme Court with the power to hear any case that any other court in the UCS could hear, which is why we refer to Supreme Court as possessing both general and concurrent jurisdiction over all causes of actions—hence the designation "Supreme" Court. And, in contrast to article I, § 6 which requires indictment of felony charges (or waiver of indictment and agreement to be prosecuted on SCI) before any court may try a defendant for a felony, there is no provision in the Constitution that imposes any similar limitation on the power of a court, including Supreme Court, to adjudicate misdemeanor charges.

---

2.  Until a controversy is "litigable," it may not be heard in Supreme Court (*see Motor Veh. Mfrs. Assn. of U.S. v State of New York*, 75 NY2d 175, 184 [1990] [once Lemon Law claim reaches a level where litigation is permissible, Supreme Court has jurisdiction to entertain it]; *see Sohn v Calderon*, 78 NY2d 755 [1991] [Supreme Court has jurisdiction over causes of action that may be pursued in UCS courts, but may not resolve in the first instance controversies the Legislature directed an administrative agency to address first under the doctrine of primary jurisdiction]).

3.  When there is a fundamental defect in an accusatory instrument (*see e.g. People v Harper*, 37 NY2d 96 [1975]), a different jurisdictional issue is presented than the one we confront here. In such a case, it would be improper for any court to issue a judgment of conviction because there is a substantive deficiency in the cause of action. In this case, it is undisputed that the informations were valid and that defendants could have been tried and convicted in New York City Criminal Court. The controversy we must resolve relates to Supreme Court's ability to exercise concurrent jurisdiction over these cases.

Defendants nonetheless assert that the Legislature has imposed statutory restrictions on Supreme Court that prevent trials of misdemeanor charges from being entertained unless they are contained in an indictment or SCI after waiver of indictment. According to defendants, although local criminal courts such as the New York City Criminal Court may try unindicted misdemeanor cases, Supreme Court lacks subject matter jurisdiction over those matters and, in this respect, its ability to exercise concurrent jurisdiction with other UCS courts has been curtailed.

If this were in fact the case, a significant constitutional issue would be presented because we have made clear in other contexts that "[t]he Legislature cannot by statute deprive [Supreme Court] of one particle of its jurisdiction, derived from the Constitution (Art. VI), although it may grant concurrent jurisdiction to some other court" (*Pollicina*, 82 NY2d at 339, quoting *Matter of Malloy*, 278 NY 429, 432 [1938]). Addressing the precise issue raised in these appeals—whether Supreme Court may try an unindicted misdemeanor—there is authority for the proposition that it does and that any effort by the Legislature to "abridge, limit or qualify" the broad jurisdiction conferred under article VI, § 7 would be "unconstitutional and void" (*People v Darling*, 50 AD2d 1038, 1038 [3d Dept 1975]).

After review of the Criminal Procedure Law provisions on which defendants rely, we conclude that the Legislature has not adopted statutes that purport to oust Supreme Court of the jurisdiction to try unindicted misdemeanor cases and we therefore need not determine whether the Legislature could take such action, had that been its intent. The CPL divides New York courts into two categories: superior courts (which include Supreme Court and County Court) and local criminal courts (which include city courts, town courts, district courts and, as relevant here, the New York City Criminal Court). It also recognizes two types of jurisdiction: "preliminary jurisdiction" and "trial jurisdiction." Preliminary jurisdiction encompasses conducting arraignments, assigning counsel, setting bail and, in the case of a felony complaint, conducting a preliminary hearing if that right is not waived by defendant (*see Matter of Molea v Marasco*, 64 NY2d 718, 722 [1984, dissenting op]). As the title suggests, trial jurisdiction includes the authority to resolve the case on the merits by conducting a trial or accepting a guilty plea, among other actions such as conducting a suppression hearing (*see Matter of Michelson v Clyne*, 84 AD2d 883 [3d Dept 1981]). In

these appeals, we are concerned only with whether Supreme Court had trial jurisdiction because, under the BCD and IDV directives, misdemeanor cases are not transferred to Supreme Court until after the preliminary proceedings associated with arraignment have concluded.

CPL 10.20, entitled "Superior courts; jurisdiction," states that superior courts—which include Supreme Court—"have trial jurisdiction of all offenses" and further specifies that they have exclusive trial jurisdiction of felonies and "[t]rial jurisdiction of misdemeanors concurrent with that of the local criminal courts" (CPL 10.20 [1] [a], [b]). A reciprocal provision relating to the jurisdiction of local criminal courts states that they have "[t]rial jurisdiction of misdemeanors concurrent with that of the superior courts but subject to divestiture thereof by the latter in any particular case" (CPL 10.30 [1] [b]). Neither statute conditions the power of a superior court to try misdemeanor cases on the existence of an indictment or SCI. To the contrary, both unqualifiedly state that superior courts possess subject matter jurisdiction to try all misdemeanor cases, a point that is evident from the broad language in CPL 10.30 (1) (b) recognizing that a superior court can exercise its divestiture authority "in any particular case." In its express language, the CPL acknowledges that superior courts—such as Supreme Court—have subject matter jurisdiction to try misdemeanor cases.

Nor do the divestiture statutes found elsewhere in the CPL undermine this conclusion. CPL 170.20 requires the transfer of a case to a superior court if the People secure an indictment and CPL 170.25 permits the defendant to obtain an order from a superior court directing that a misdemeanor charge be submitted to the grand jury if the interests of justice so require. These statutes discuss only the jurisdiction of local criminal courts, which lose the power to resolve a case if divestiture occurs. The provisions neither state nor imply that a superior court lacks jurisdiction until a case is indicted (or there has been a waiver of indictment and agreement to be prosecuted on SCI).

The divestiture statutes address the ability of the parties—the People or the defendant—to effectuate the removal of a case to a superior court such as Supreme Court. They do not address, much less revoke, the transfer powers granted to Supreme Court and UCS administrators in the Constitution and Judiciary Law § 211. To the contrary, the fact that CPL 170.25 permits a defendant to apply to Supreme Court for an order requiring a misdemeanor charge that is pending in a local

criminal court to be submitted to a grand jury belies defendants' argument that Supreme Court lacks jurisdiction over such a charge until it is incorporated in an indictment—if Supreme Court could not exercise subject matter jurisdiction over unindicted misdemeanor charges, it would not be able to entertain a CPL 170.25 application.

Defendants' contention—credited by the First Department—that CPL 210.05 is a jurisdictional provision that precludes Supreme Court from trying unindicted misdemeanor cases must also be rejected. CPL 210.05 directs that "[t]he only methods of prosecuting an offense in a superior court are by an indictment filed therewith by a grand jury or by a superior court information filed therewith by a district attorney." Defendants urge us to interpret the provision as a divestiture statute that prevents Supreme Court from exercising subject matter jurisdiction over any criminal case until there has been an indictment or defendant has agreed to waive indictment and be prosecuted by SCI. But, by its terms, the statute discusses how a case may be prosecuted, thereby imposing a limitation on prosecutorial power. It restricts the methods by which a prosecutor may pursue charges, precluding the People from seeking a trial in the superior courts (including Supreme Court) without first obtaining an indictment or a defendant's consent to waive indictment and proceed by SCI. The statute neither mentions nor purports to curtail the concurrent trial jurisdiction granted to Supreme Court elsewhere in the CPL (*see* CPL 10.20, 10.30).

Our determination that CPL 210.05 was intended to do nothing more than restrict prosecutorial authority is consistent with the legislative history of the provision, which predated the CPL. In 1941, the Legislature amended the predecessor to CPL 210.05—Code of Criminal Procedure § 222, entitled "Crimes; how prosecuted"—to contain substantially the same restriction that it includes today, directing that "[a]ll crimes prosecuted in the supreme court, or in a county court . . . must be prosecuted by indictment" (L 1941, ch 255, § 11). The purpose of the restriction was to conform the statute to our holding in *People ex rel. Battista v Christian* (249 NY 314 [1928]), a case decided at a time when article I, § 6 unqualifiedly precluded any criminal defendant from being tried on a capital or felony offense absent indictment by a grand jury (article I, § 6 was amended in 1973 to permit a defendant to waive indictment and agree to be prosecuted by SCI in certain felony cases).

In *Battista*, a defendant charged with but not yet indicted for felony burglary petitioned the court to have an information

filed charging him with that offense and he then pleaded guilty based on the information. We concluded that the conviction must be vacated, reasoning that article I, § 6 precluded any defendant from being held to answer for a felony absent indictment and that a defendant could not waive that protection because the constitutional requirement of grand jury presentment was more than a personal right but existed to protect the public from prosecutorial excess. In response to *Battista*, the Legislature amended former Code of Criminal Procedure § 222 to delete language that had purportedly allowed a defendant to waive the constitutional right to avoid felony prosecution absent indictment, thereby imposing the limitation that was carried forward in CPL 210.05 (*see* Mem of Comm on Crim Cts Law and Pro of Assn of Bar of City of NY, at 3, Bill Jacket, L 1941, ch 255; *see also* 7th Ann Rep of NY Jud Council, 1941 NY Legis Doc No. 23, at 250).

Thus, when it amended the statute in 1941, the Legislature was concerned with attempts to subvert the then-existing unqualified constitutional mandate that all felonies be prosecuted on indictment—it did not have misdemeanor prosecutions in mind. Indeed, since the New York Constitution has never included a right to prosecution by indictment in misdemeanor cases, the constitutional analysis underlying *Battista* was not applicable to misdemeanors (in the wake of the 1973 amendment to the Constitution allowing waiver of indictment in some felony cases, *Battista* is now of limited relevance in the felony context as well). There is no basis to believe that, in amending the predecessor to CPL 210.05 to reflect our decision in *Battista*, the Legislature intended to impair Supreme Court's ability to try misdemeanors.

In light of our conclusion that CPL 210.05 can properly be read as a nonjurisdictional limitation on prosecutorial authority, defendants' alternative interpretation would not control even if it was plausible. "Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results" (*Matter of Jacob*, 86 NY2d 651, 667 [1995] [citations omitted]). As explained above, the general rule is that the Legislature may not curtail the concurrent subject matter jurisdiction vested in Supreme Court in article VI, § 7. Were we to adopt defendants' view that CPL 210.05 divests Supreme Court of its power to try unindicted misdemeanor cases—cases that the New York City Criminal Court, another UCS court, is

permitted to hear—a serious question would be raised about the constitutional validity of CPL 210.05 (*see e.g. Darling, supra*). Faced with the choice between an interpretation that is consistent with the Constitution (and the jurisdictional statutes in the CPL) and one that creates a potential constitutional infirmity, courts are to choose the former.

██ ██ Given its language and legislative history, we reject the notion that CPL 210.05 precludes Supreme Court from exercising trial jurisdiction over misdemeanor cases concurrent with other UCS courts. To the extent defendants challenge the transfer of their cases on equal protection grounds, this contention also lacks merit because defendants have not identified any respect in which they received less favorable treatment in Supreme Court than they would have received had their non-jury trials been conducted in the New York City Criminal Court.[4] We therefore hold that Supreme Court had subject matter jurisdiction over defendants' misdemeanor cases.

### Fernandez

After he was tried in the IDV Part of Supreme Court, defendant Fernandez appealed his attempted aggravated harassment in the second degree conviction to the Second Department, arguing that Supreme Court lacked the authority to try his case and further contending that he was entitled to a new trial based on the prosecutor's elicitation of uncharged crime evidence. The Second Department considered and rejected both arguments. We have held that defendant's jurisdictional claim lacks merit and, since defendant has not briefed his claim of evidentiary error in this Court, it is deemed abandoned. An affirmance is therefore warranted.

### Correa and Mack

In separate trials, defendants Correa and Mack were convicted in the BCD part of Supreme Court and, in the briefs initially filed in the First Department, they raised various arguments concerning the weight and sufficiency of the evidence presented at trial. After requesting additional submissions on the jurisdictional argument, the First Department reversed both

---

4. Defendants also have not argued that they were disadvantaged by the fact that their appeals were heard in the Appellate Division rather than the Appellate Term. To the contrary, defendants Correa and Mack adopted the First Department's conclusion that this procedural outcome was, if anything, a "presumed benefit" (70 AD3d at 540).

convictions based on the threshold jurisdictional claim and hence did not reach the other contentions. Having disposed of the threshold issue, we reverse the orders of the First Department and remit in each case so that the court can address the arguments that were not decided.

Accordingly, in *Correa* and *Mack*, the order of the Appellate Division should be reversed and the cases remitted for consideration of the facts and issues raised but not determined on the appeals to that court. In *Fernandez*, the order of the Appellate Division should be affirmed.

Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

In *People v Correa* and *People v Mack*: Order reversed, etc.

In *People v Fernandez*: Order affirmed.