OPINION OF THE COURT
Orlando Marrazzo, Jr., J.
By way of background, on July 24, 2014, Kevin M. (petitioner) was arrested for stalking and related charges for acts he committed against Robyn Fenty.
Ms. Fenty, a Grammy-winning singer and actress of substantial fame, is more commonly known as “Rihanna.” Petitioner and Ms. Fenty have no familial, personal or professional relationship whatsoever.
Nevertheless, petitioner has embarked on the relentless pursuit of Ms. Fenty. He authored hundreds of pages of handwritten letters. Some of the letters he mailed to Ms. Fenty at her California residence, while others he hand-delivered to her apartment building in Manhattan.
The letters manifest various grandiose and delusional ideas, including that petitioner and Ms. Fenty are in a romantic relationship, that his name is embedded in various songs sung by her and that she and numerous other famous artists have misappropriated petitioner’s creative work without accreditation and remuneration to him.
As set forth herein, Ms. Fenty became frightened when she read some of petitioner’s deranged missives that illustrate his *457 blatant infatuation with her. As a result, Ms. Fenty and her counsel contacted the New York City Police Department (NYPD).
On July 24, 2014, petitioner was arrested by NYPD homicide detectives and charged with stalking in the third degree (Penal Law § 120.50 [3]), stalking in the fourth degree (Penal Law § 120.45 [1]) and harassment in the first degree (Penal Law § 240.25). All of these charges are misdemeanors. In addition to an order of protection (CPL 530.13), the Criminal Court issued an examination order on petitioner’s fitness to stand trial pursuant to CPL 730.40.
Upon the finding that petitioner was not fit to stand trial, he was remanded to the custody of the Commissioner of the New York State Office of Mental Health under a final order of observation not to exceed 90 days, and the accusatory instrument was dismissed under article 730 of the Criminal Procedure Law. Any order of protection issued by the Criminal Court was vacated by operation of law upon such dismissal. (CPL 530.13, 730.40 [2].)
Petitioner was transferred to South Beach Psychiatric Center (SBPC) on Staten Island, New York. His status was converted from criminal to civil under Mental Hygiene Law § 9.27 (a) (commonly referred to as a 2-PC) as a person “alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians.”
Subsequently, counsel for petitioner, Mental Hygiene Legal Service (MHLS), filed a request for a hearing on his involuntary admission. The hearing requested by MHLS commenced on October 23, 2014.[1]
The Hearing/Findings of Facts
The court, having had the opportunity to observe the witnesses testify at this hearing and observe their demeanor, specifically finds Dr. Paranal and Detective Barbara to be credible in all respects. The following[2] constitutes the court’s findings of fact:
Dr. Aurora Paranal, M.D., a physician at SBPC and an expert in the field of psychiatry, testified as petitioner’s treating psychiatrist. In her opinion, the 54-year-old petitioner suffers from *458 psychotic disorder, not otherwise specified. The symptomatology includes delusions, hallucinations, grandiosity, paranoia and disorganization of thinking. When one engages him in conversation, he proceeds from one topic to another in what is clinically known as a “flight of ideas” that reaches the point of practical incoherence.
According to his doctor, his judgment is severely impaired and he lacks any insight into his mental illness. He has been aggressive on the unit at SBPC. In addition, he was homeless for 17 years and, when he was arrested, he was infected with scabies. His hygiene is extremely poor and he is highly malodorous.
It was the opinion of the treating psychiatrist that petitioner is a physical danger to both himself and others.
In illustration of some of his delusions, Dr. Paranal testified that petitioner believes that Rihanna and other famous artists stole his material and he wants $1.3 billion in compensation thereof. He believes that the attorneys and the Criminal Court conspired against him by finding him not fit to proceed. (Petitioner, in his own testimony, repeatedly denies having a mental illness.) Similarly, he believes that if you “suppress the music” in Rihanna’s songs and you listen carefully, you will hear her sing his name.
For its part, MHLS repeatedly objected to any reference by the treating psychiatrist as to petitioner’s actions underlying the stalking charges, including the voluminous letters he sent to Ms. Fenty (hearing tr at 10-11) on the ground of Dr. Paranal’s lack of “personal knowledge” of the crimes and “the contents of letters which the doctor doesn’t have.” (Id.)
While the court overruled counsel’s objections, to ensure a complete and accurate record in fairness to all parties, it directed the New York County District Attorney (NYDA) to present the letters as possible evidence in this hearing. MHLS objected[3] to the introduction of the letters and the NYDA video.
*459 In any event, petitioner himself, under oath, consented to the production of the letters in court and he explicitly waived any sealing of the criminal case in this regard (hearing tr at 34-35).
The letters are all handwritten and they individually range from approximately 40 to more than 80 pages in length.
Petitioner admitted in court and in his Mirandized video statement to the NYDA (in evidence as court exhibit 2) that he obtained Ms. Fenty’s California and New York residential addresses via the Internet. He acknowledged that he mailed some of his letters to her California home and that he hand-delivered the other letters to the doorman of her Manhattan apartment building. He also said that Ms. Fenty fell in love with him and that she and the other artists are “robbing [him] blind.”
In his letters and testimony, petitioner alludes to the possibility of “gang rape,” that he will “bum rush” Ms. Fenty’s apartment and that she is a “bitch.” In addition, his letters are laced with other profanities and violent diatribes and make eerily precise references to Ms. Fenty’s Manhattan apartment (including the type of apartment). In at least two places, petitioner’s missive appears to read, “Am I scaring you tonight?” Other portions read, “I want to see Rihanna”; and threaten that petitioner “will be spitting acid.”
Additional rank phrases include: “Shit has to hit the fan . . . We killed off your true love”; “House on fire with girl inside”; “Does it look like I am some type of masturbating retard in these letters?”; “Our love”; “Yeah, we’ll be at the dinner table in a posh NYC restaurant with me in a straight jacket”; “Heard this guy is dangerous”; “I will shut down the BET Awards due to outrage that I was not notified that Rihanna was making songs about me”; “You gotta kill the one killer bee”; and “Rihanna, why are you so nervous?”
On October 30, 2014,[4] Detective Joseph Barbara of the Manhattan South Homicide Squad testified as to the NYDA’s videotaped statement and his stalking investigation, which included a review of petitioner’s letters. Petitioner, of his own volition, authenticated the letters introduced into evidence as having been authored by him (hearing tr at 57).
*460 After Ms. Fenty reviewed the letters, she informed the police that she was in fear for her safety. The letters indicated that she and petitioner were meant to be together and that he is “right around the corner [from her Manhattan apartment] all the time” at a McDonald’s. Detectives verified the location, which is one-half block from Ms. Fenty’s apartment, as well as the fact that petitioner frequented that McDonald’s.
According to Det. Barbara, the apartment building’s security video clearly showed petitioner drop off the letters at the front desk. The doorman indicated that petitioner asked that the letters be given to “Rihanna.”
Some of the letters, per the building staff (and as corroborated by the security video), were hand-delivered by petitioner at one o’clock in the morning. He was also observed to have been lurking across the street around that same time.
The last time petitioner was at Ms. Fenty’s apartment, the doorman requested identification and was shown petitioner’s benefit card.
On another occasion, Det. Barbara and his partner went to a FedEx location near Ms. Fenty’s apartment; they observed petitioner using a laptop. Although they conducted no search of his computer, they were able to observe in plain view on the computer screen a photo of Ms. Fenty as petitioner was shutting it down.
Upon being recalled by SBPC, Dr. Aurora Paranal, M.D. testified that she was present in the courtroom throughout the entirety of the hearing on both dates.
Based on her observations of petitioner throughout the two-day hearing, she opined that petitioner continued to express the delusions that she had described in her earlier testimony. She also noted that petitioner became angry and confrontational at times in court.
As to the NYDA video, the doctor further noted that petitioner’s speech was overproductive and pressured and that his thinking evinces grandiose delusions.
Dr. Parana! also testified that petitioner, as part of his lack of insight, refuses to take medication.
Petitioner was then permitted to retake the stand. At his request, a handwritten chart of sorts replete with nonsensical writings was introduced into evidence as petitioner’s exhibit A. He testified that he drafted the exhibit. He said that it “shows the linear gods” and “I think that’s why the artists love my *461 work . . . that is why they are obsessed with my material” (hearing tr at 71-72).
Parties’ Legal Memoranda
Based on the stark facts of this case, the court directed the parties, including the NYDA, to submit memoranda on whether an order of protection may issue in this matter.
While their reasoning was somewhat divergent, the consensus among the parties answered the question in the negative.
The fact that there is consensus amongst the parties does not “relieve this Court of the performance of [its] judicial function.” (People v Lewis, 26 NY2d 547, 550 [1970], quoting Young v United States, 315 US 257, 258 [1942].)
Conclusions of Law
The court’s conclusions of law are as follows:
SBPC (respondent) has established, by clear and convincing evidence, that Kevin M. (petitioner) is mentally ill and in need of further care and treatment, that he poses a substantial threat of physical harm to himself and to others, and that retention is the least restrictive means to treat him. (Matter of Paulina D., 104 AD3d 883 [2d Dept 2013], lv denied 21 NY3d 931 [2013].) Thus, petitioner’s application for release is denied.
It is incontrovertible that petitioner is severely psychotic and delusional. He appears to be a ticking time bomb who is wholly fixated on Ms. Fenty, and poses a direct threat of serious physical harm or death to her and anyone around her (e.g., the doormen in her Manhattan apartment, building maintenance workers, other building residents and innocent bystanders).
In fact, this case appears to have been a heartbeat away from tragedy, not unlike John Lennon and Mark David Chapman, if not for the swift work of NYPD detectives.
Petitioner’s references to “bum rushing” Ms. Fenty in her apartment and gang rape, coupled with his lurking outside her apartment building at one o’clock in the morning and his numerous other patent acts of stalking, are more than sufficient to instill fear in her or any reasonable person.
Due to his fixation on Ms. Fenty, and based on his escalating, goal-oriented behavior to personally confront her, tragedy is inevitable unless petitioner receives immediate psychiatric treatment on a continuous basis and into the indefinite future.
There is no cure for petitioner’s mental illness under Axis I of the Diagnostic and Statistical Manual of Mental Disorders. It is *462 a chronic illness and only appropriate and uninterrupted treatment can possibly restore and maintain petitioner’s competency.
Under these factors, New York’s current statutory framework provides no express mechanism for a court to issue an order of protection in favor of Ms. Fenty. However, without such an order, petitioner can legally attempt to telephone or write her (via postal mail or electronic mail or other means) without fear of arrest or incarceration.
Nevertheless, it is of much greater concern that if petitioner “escaped” from SBPC, there is presently no explicit legal prohibition of his returning to Ms. Fenty’s Manhattan apartment for, e.g., purposes of intimidation.
SBPC is not a “[s]ecure facility” under the law (14 NYCRR 541.1 [z]). Therefore, should petitioner “escape” (or, more aptly, leave) SBPC without legal authorization,[5] petitioner would not be committing a crime. (People v Ortega, 69 NY2d 763 [1987]; see also Matter of Dylan C., 16 NY3d 614 [2011].) Petitioner could not be charged with “escape” or other related offense under article 205 of the Penal Law or any other crime. Hence, the police would lack probable cause to arrest him until he engages in overt criminal activity. (CPL 140.10; see also 120.10.)
The foregoing is only the first of several glaring voids in New York’s law affecting the mentally ill that invite tragedy.
Nor is there any automatic legal mechanism that would permit the police to immediately arrest and return the petitioner to the hospital.
New York’s Assisted Outpatient Treatment (AOT) law (Mental Hygiene Law § 9.60 [also known as Kendra’s Law]), was itself born out of horrific tragedy (i.e., the public outcry when, in 1999, a mentally ill person with a long history of schizophrenia shoved 32-year-old Kendra Ann Webdale to her death in front of an oncoming 400-ton subway train) and was designed to provide structure and supervision to those patients deemed appropriate for release from inpatient treatment, but who are still in need of supervision. These patients are often labeled “revolving door patients,” as they frequently have long histories of psychiatric hospitalizations and penchants for violence towards themselves or others.
*463 Petitioner herein may incur a substantial period of inpatient care and treatment; however, his eventual release on AOT is quite possible. Moreover, Kendra’s Law and other facets of the Mental Hygiene Law, have several gaping holes that invite further tragedy.
As written, Mental Hygiene Law § 9.60 does not permit any form of court-ordered condition directing the patient to refrain from approaching or otherwise contacting any particular person, or to stay away from any specific location.
In an illogical point of fact, under AOT, a mentally ill person who has a history of attempting to shove people off a subway platform could not be ordered by the court to stay away from subway stations.
This legal void would encourage[6] the AOT patient, under this scenario, to return to an environment (and victim pool) that serves as a documented trigger to violence. Reasonable persons would view this as patently absurd.
Ironically, Kendra’s Law explicitly denies a supervising AOT court from holding a patient in contempt or issuing a civil commitment order if s/he fails to comply with any condition of the AOT. (Mental Hygiene Law § 9.60 [n].) In that same vein, the AOT court cannot order a patient to take necessary psychiatric medications. (Id.)
In fact, under the current law, an AOT patient can only be returned to the hospital on an extremely limited basis through an unfortunately protracted process designed to cajole, rather than compel, a noncompliant patient with a history of substantial danger to himself or others to appear for examination. (See e.g. Matter of K.L., 1 NY3d 362, 368 [2004].)
As a result, it takes at least several days that may well be critical to life and death, to return to the hospital for examination an AOT patient for whom there is reason to believe has mentally decompensated.
Finally, it is noteworthy that if the AOT court disagrees with the extent of the proposed treatment plan, it has only two choices. The court can either grant it “as is” or deny it; however, the latter means the mentally ill patient requiring supervision will not be placed on AOT. Instead, s/he will be freed from any structure, supervision or accountability whatsoever.
In the opinion of this court, the only express statutory provision similar to an order of protection is found in CPL 330.20 (1) *464 (o), i.e., a “special order of conditions” (see also CPL 140.10 [4] [b]). This is inapplicable to the petitioner since he has never been adjudicated “not responsible by reason of mental disease or defect” under CPL 330.20.
However, New York statutes do expressly permit a court of competent jurisdiction to issue orders of protection under the Criminal Procedure Law (CPL 530.12, 530.13), Domestic Relations Law (Domestic Relations Law §§ 240, 252) and the Family Court Act (Family Ct Act §§ 812, 828).
If granted, the issuance of an order of protection would alert the police that petitioner’s presence around Ms. Fenty’s home, for instance, poses a credible and documented threat. More critically, it would provide explicit legal authority to police to immediately effect an arrest of petitioner and return him to the hospital, thereby ensuring not only the safety of Ms. Fenty and those in proximity to her, but of petitioner himself. Absent same, a police officer who is alerted to petitioner’s presence by (for example) a building staff member, may not believe that he has any legal basis to arrest him, and may reasonably understand petitioner’s presence outside the apartment building as entirely legal or no more than a violation,[7] rather than a criminal offense (e.g., harassment in the second degree [Penal Law § 240.26]). In such circumstances, an arrest is unlikely (cf. CPL 140.10).
Moreover, other than his substantial hygienical deficiencies, petitioner does not patently exhibit the indicia of an “emotionally disturbed person” toward the public at large; e.g., he does not run up to random people on the street waving his hands in their faces, nor does he scream or curse while impeding traffic, etc. If he did act in such a manner, a police officer would have a basis to remove him to the hospital for an emergency evaluation (Mental Hygiene Law § 9.41).
General Jurisdiction of Supreme Court
The supreme court shall have general original jurisdiction in law and equity. Its jurisdiction may only be circumscribed by those “exceptions, additions and limitations created and imposed by the constitution and laws of the state.” (Judiciary Law § 140-b.)
*465 “The [New York] Supreme Court is a court of general jurisdiction, and it is competent to entertain all causes of action [in law and equity] unless its jurisdiction has been specifically proscribed.” (Jones v Banner Moving & Stor., 78 Misc 2d 762 [Sup Ct, Kings County 1974]; NY Const, art VI, § 7; Judiciary Law § 140-b.)
Accordingly, it has been held that notwithstanding CPL 210.05, the supreme court is not prohibited from exercising its constitutional jurisdiction to try misdemeanor charges in the absence of an indictment or superior court information. (People v Fernandez, 72 AD3d 303 [2d Dept 2010], lv granted 14 NY3d 807 [2010], affd 15 NY3d 213 [2010].)
Declaratory Judgment/Permanent Injunctive Relief
Declaratory judgment and a grant of permanent injunctive relief is wholly within the province of this court’s jurisdiction in a justiciable controversy. (CPLR 3001 et seq.; see also CPLR 6301 et seq.)
Here, the justiciable controversy is neither hypothetical nor moot. (See Aetna Life Ins. Co. v Haworth, 300 US 227 [1937].) Moreover, the form of the action or proceeding can be molded by the court. (Bloom v Mayor of City of N. Y., 35 AD2d 92 [2d Dept 1970].)
Once the court has assumed jurisdiction, it has the power to grant any relief whether prayed for or not, including an injunction. (New York Cent. R.R. Co. v Lefkowitz, 12 NY2d 305 [1963].)
“It is fundamental that an injunction does not issue ... as punishment.” (Sandfield v Goldstein, 33 AD2d 376, 379 [3d Dept 1970] [internal quotation marks omitted].) Thus, it was recently held that a permanent injunction is appropriate to enjoin a defendant from mailing any nonfinancial correspondence to plaintiff where the latter had demonstrated that he would suffer irreparable harm absent the injunction. (Meccariello v Meccariello, 46 AD3d 640 [2d Dept 2007].)
In addition, injunctive relief is available notwithstanding the lack of a statutory basis. (Cf. Carr v Carr, 60 AD2d 63, 67 [2d Dept 1977] [“matrimonial action” includes an action for declaratory judgment adjudicating the nullity of a foreign judgment of divorce decree despite a lack of any such procedural avenue in the Domestic Relations Law], revd on other grounds 46 NY2d 270 [1978].)
While mentally incompetent persons may not be punished criminally, New York law has historically attributed civil li *466 ability to them for any tort that they commit. (Williams v Hays, 143 NY 442, 447 [1894]; M.S. v County of Orange, 64 AD3d 560, 563 [2d Dept 2009].)
To obtain a declaratory judgment with the equitable relief of a permanent injunction, one must allege a violation of a right presently occurring, or threatened and imminent; that the plaintiff has no adequate remedy at law; that serious and irreparable injury will result if the injunction is not granted; and that the equities balance in plaintiffs favor. (Elow v Svenningsen, 58 AD3d 674 [2d Dept 2009] [citations omitted].)
Here, every single one of the foregoing factors is plainly satisfied, including the right of Ms. Fenty to be free from the fear of sexual assault, serious physical injury or death, as well as her right to quiet enjoyment of her real property free of nuisance.[8]
Without a permanent injunction, petitioner may legally continue to annoy, harass, intimidate or otherwise strike fear in the heart of Ms. Fenty, regardless of any lack of intent. It is entirely foreseeable that if he were free to continue to act upon his psychotic delusions without this court’s intervention, it may result in the death of Ms. Fenty or other innocent persons. The record demonstrates that this clear and present danger[9] and the need for permanent injunctive relief has been established beyond a reasonable doubt.
None of the parties has provided this court with any legal basis for SBPC to prevent petitioner from making any telephone calls or sending mail to Ms. Fenty.
As previously indicated, there are no legal impediments to petitioner leaving SBPC, let alone any potential legal consequences to be faced by him (e.g., a prosecution for escape, confinement to a secure mental facility, etc.). More critically, however, the police would lack any immediate and emergent basis by operation of law to arrest petitioner should he leave SBPC and present himself in the lobby of Ms. Fenty’s apartment building.
On the other hand, a permanent injunction or order of protection that orders or directs petitioner, inter alia, to stay away *467 from Ms. Fenty and her home will not amount to anything other than a de minimis impact on petitioner’s liberty, as it has not been shown that he or any of his friends, relatives or other associates reside in or near Ms. Fenty’s building, nor does he have employment located nearby.
“Justice is the means by which established injustices are sanctioned.” (Anatole France, Crainquebille 27 [1922].) If this court is powerless to enjoin the petitioner from continuing to threaten serious physical injury or death upon an innocent person, then justice’s core has become hollow.
Civil Protection Order
Numerous other jurisdictions, such as California (Cal Civ Proc Code § 527.6) and Colorado (Colo Rev Stat § 13-14-106), have “civil harassment” or “civil protection orders” for those situations, such as the instant matter, where the parties have no intimate or familial relationship and where no criminal matter is pending between them.
In exercising its equity jurisdiction, this court cannot fathom a more dire and stark set of facts warranting a permanent injunction[10] and an order of protection. Manifestly, it cannot remain idle in the face of a serious and imminent threat to human life.
When a dangerously mentally ill, severely psychotic individual who is fixated on a particular victim lurks outside that victim’s home in the dark of night, you do not call a doctor. You call the police.
Clearly, an order of protection is not bulletproof. Nevertheless, an order of protection is plain on its face and will support an immediate arrest of petitioner if violated. To wait for a doctor to file papers with a court or other authorities in an attempt to return petitioner to an involuntary hospital setting is entirely insufficient, and, under these facts, inexcusable.
In the opinion of this court, the provisions of the Mental Hygiene Law are grossly inadequate to protect not only Ms. Fenty and other innocent persons, but just as critically, petitioner himself. He is not a criminal and the court’s judgment should not be viewed as punitive.
Finally, the court notes that the relief granted herein is exceptional. It is not meant to set a precedent for preventing *468 other dangerously mentally ill persons who are predisposed to commit violence generally, as opposed to the instant case, where petitioner is infatuated with and dangerously fixated on essentially one person.
Accordingly, it is hereby adjudged and ordered that petitioner, herein known as Kevin M. (date of birth xx/xx/xxxx; NYSID: xxxxx) and as set forth in the separate order of protection referenced herein, is permanently enjoined and restrained from initiating, engaging in or otherwise facilitating any contact whatsoever with Robyn Fenty who is also known as “Rihanna,” and it is further adjudged and ordered that petitioner permanently stay away from Robyn Fenty, her home, school, place of business and place of employment, as well as any other real property or location in which Robyn Fenty has an interest in this state or in any other jurisdiction in the United States, and it is further adjudged and ordered that petitioner permanently refrain from communication or any other contact by mail, telephone, email, voice mail or other electronic or other means with Robyn Fenty, and it is further adjudged and ordered that petitioner permanently refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, trespass or any criminal offense against Robyn Fenty and any members of said protected person’s family or household, and it is further adjudged and ordered that petitioner permanently refrain from intentionally injuring or killing without justification any pets or companion animals owned or possessed by Robyn Fenty and any members of said protected person’s family or household, and it is further adjudged and ordered that petitioner immediately surrender any and all handguns, pistols, revolvers, rifles, shotguns and other firearms owned or possessed by him and that petitioner not purchase or otherwise obtain or possess any further guns or firearms, and it is further ordered that the clerk of court immediately transmit certified copies of this decision, judgment and order, as well as the separate order of protection incorporated herein by reference to the New York State Attorney General (two certified copies, with one designated for South Beach Psychiatric Center), the New York County District Attorney (six certified copies), and Mental Hygiene Legal Service, and it is further ordered that the clerk of court enter and otherwise *469 transmit, a certified copy of this decision, judgment and order, as well as the separate order of protection incorporated herein by reference to the New York State Registry of orders of protection and the New York City Police Department, and it is further ordered that the New York County District Attorney may forward a certified copy or non-certified copy of this decision, judgment and order, as well as the separate order of protection incorporated herein by reference, and the arrest photo of Kevin M. to Robyn Fenty and her attorney, as well as any member of the New York City Police Department or other law enforcement agency, and it is further ordered that the court reporter may furnish a complete transcript of these proceedings to the Commissioner of the New York State Department of Mental Health, South Beach Psychiatric Center, Mental Hygiene Legal Service, the New York County District Attorney and personal counsel for Robyn Fenty upon their request and at their own expense, and it is further ordered that the clerk of court retain the above-captioned index number in this and all other matters—pending or impending—between Kevin M. and South Beach Psychiatric Center.

. Testimony was taken on this date and on October 30, 2014.

. The preceding background information is hereby incorporated within this court’s factual findings.

. A party cannot use an objection as both a shield and a sword. Here, MHLS initially objected to Dr. Paranal’s reference to petitioner’s letters and conduct underlying the stalking charges based on hearsay and “lack of personal knowledge” only to subsequently object to the introduction of the nonhearsay evidence (i.e., the letters themselves), the NYDA video of petitioner himself (i.e., his own admissions) and the detective’s testimony as to his own personal observations surrounding various aspects of his investigation in response to counsel’s initial objections. It is axiomatic that the detective’s testimony and related evidence were introduced to demonstrate *459 “dangerousness” of petitioner as required in this proceeding under article 9 of the Mental Hygiene Law, as well as to ameliorate any purported hearsay.

. An associate of the law firm representing Ms. Fenty was permitted by the court to observe the proceedings, but he and his firm were enjoined from communicating any description or information derived from his observations to any person or entity other than within his own firm and with his client.

. See, for example, Mental Hygiene Law § 29.15 (discharge and conditional release of patients from inpatient facilities). This provision is only applicable for a period not to exceed the patient’s current retention, and does not permit a court-ordered condition akin to an order of protection directing the patient to stay away from any specified person or place.

. It certainly would not dissuade the patient.

. The practical reality is that stalking offenses, by their very nature, necessarily involve the recitation of a highly-involved narrative in order to establish reasonable cause to believe that a suspect committed such an offense. (CPL 140.10 [1] [b].)

. (See Chelsea 18 Partners, LP v Sheck Yee Mak, 90 AD3d 38 [1st Dept 2011]; 34 Hillside Realty Corp. v Norton, 198 Misc 302 [City Ct, Spec Term, Bronx County 1950].) Ms. Fenty is certainly “entitled to a judgment restraining [Kevin M.] from the commission or continuance of an act, which, if . . . continued . . . would produce injury [and possibly death]” to her. (CPLR 6312 [a].)

. Petitioner still refuses to take necessary antipsychotic medications.

. The instant order does not contain the street address of Ms. Fenty’s New York County apartment or petitioner’s full name. Instead, both are reflected in the separate order of protection that is hereby incorporated by reference.